**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JASON HALASA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ITT EDUCATIONAL SERVICES, INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Civil Action No.
1:10-cv-0437 [WTL-MJD]

**DEFENDANT ITT EDUCATIONAL SERVICES, INC.'S BRIEF IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN THE**
**ALTERNATIVE FOR SUMMARY ADJUDICATION OF THE ISSUES**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................ 3

    A.   As The College Director, Halasa Was Also the "Local Ethics And
        Compliance Officer" ..................................................................................... 3

    B.   Upon Accepting His Position As The College Director, Halasa Knew That
        The Lathrop School Was Underperforming And Needed Strong Leadership ....... 3

    C.   ITT Terminated Halasa's Employment Because A Significant Number Of Events
        Over A Short Period Of Time Caused ITT To Conclude That He Lacked
        The Necessary Leadership Skills And Judgment .................................................. 4

        i.    Inappropriate Termination Announcement ................................................ 4

        ii.   Concerns During Operational Review ...................................................... 5

        iii.  Ethics Alert Line Complaints Against Halasa ........................................... 5

        iv.   Lack of Leadership Over Recruitment ...................................................... 6

        v.    Mafia References ...................................................................................... 9

        vi.   Failure to Manage the Career Services Department ................................. 9

        vii.  "Marginal" Audit Score ........................................................................... 10

        viii. Lack of Preparation for Call with Simich .................................................. 10

        ix.   Termination Decision ................................................................................ 11

    D.   Halasa's Alleged Complaints .......................................................................... 12

        i.    Grades/Attendance ................................................................................... 12

        ii.   The Wonderlic Placement Test .................................................................. 13

        iii.  Job Placement Figures – GEI Forms ......................................................... 15

        iv.   Recruitment Representative Compensation ............................................... 17

        v.    Document Destruction ............................................................................... 18

i

E.      Halasa's Representations That The School Was In Compliance ........................ 18

F.      Had Halasa Still Been Employed, ITT Would Have Terminated Him On
        October 14, 2010 When ITT Learned That He Was Signing GEI Forms
        With A "Rubber Stamp" Without Even Reading Them .................................... 19

III.    THE RETALIATION CLAIM UNDER SECTION 3730(h) OF THE FALSE
        CLAIMS ACT FAILS AS A MATTER OF LAW ........................................................ 19

        A.      Halasa Cannot Establish The First Element Of His Prima Facie Case Because
                Reporting Mere Speculation Is Not Protected Activity – A Plaintiff Must
                Have A Reasonable, Good Faith Belief ............................................................ 20

        B.      Halasa Cannot Establish The Second Element Of His Prima Facie Case Because
                He Cannot Prove That ITT Had Knowledge Of His Alleged Complaints .......... 24

                1.      None Of The Four Decision Makers Had Knowledge Of Halasa's
                        Alleged Complaints ................................................................................. 24

                2.      Halasa Cannot Meet the Heightened Notice Standard Applicable to
                        "Fraud Alert Employees" ........................................................................ 25

        C.      Even If Halasa Could Establish A Prima Facie Case, He Cannot Establish That
                ITT's Legitimate, Non-Retaliatory Reason For Termination Is Pretext For
                Retaliation ...................................................................................................... 28

IV.     THE CALIFORNIA WRONGFUL TERMINATION IN VIOLATION OF
        PUBLIC POLICY RETALIATION CLAIM ALSO FAILS AS A MATTER
        OF LAW FOR THE SAME REASONS ....................................................................... 32

        A.      Halasa Cannot Establish a Prima Facie Case of Retaliation .............................. 33

        B.      Halasa Also Cannot Establish Pretext ............................................................. 33

V.      THE "AFTER ACQUIRED EVIDENCE DOCTRINE" LIMITS THE
        AVAILABLE REMEDIES ........................................................................................ 34

VI.     CONCLUSION ......................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Balmer v. HCA, Inc.*,
   423 F.3d 606 (6th Cir. 2005) ................................................................... 28

*Berg v. BCS Financial Corp.*,
   No. 04 C 7922, 2006 WL 273541 (N.D. Ill. 2006) ................................... 34

*Boze v. General Elec. Co.*,
   No. 4:07CV-74-M, 2009 WL 2485394 (W.D. Ky. Aug. 11, 2009) ........................ 29

*Brandon v. Anesthesia & Pain Management Associates*, *Ltd.*,
   277 F.3d 936 (7th Cir. 2002) ....................................................... 25, 27, 28

*Fanslow v. Chicago Mfg. Center*,
   384 F.3d 469 (7th Cir. 2004) ................................................................... 20

*Fisher v. San Pedro Peninsula Hosp.*,
   214 Cal. App. 3d 590 (1989) ................................................................... 32

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
   545 U.S. 409 (2005) ............................................................................... 20

*Hersant v. Dept. of Social Servs.*,
   57 Cal. App. 4th 997 (1997) ................................................................... 33

*Kuhn v. LaPorte Cty. Comprehensive Mental Health Council*,
   No. 3:06-CV-317 CAN; 2008 WL 4099883 (N.D. Ind. 2008) ................................ 26

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ............................................................................... 19

*McKennon v. Nashville Banner Publishing Co.*,
   513 U.S. 352 (1995) ............................................................................... 34

*Neal v. Honeywell, Inc.*
   942 F. Supp. 388 (N.D. Ill. 1996) ........................................................... 19

*Neal v. Honeywell, Inc.*,
   33 F.3d 860 (7th Cir. 1994) ............................................................. 20, 24

*Scott v. Metropolitan Health Corp.*,
   234 Fed. Appx. 341 (6th Cir. 2007) .......................................... 19, 28, 30, 31

*Treat v. Tom Kelley Buick Pontiac GMC, Inc.*,
   710 F. Supp. 2d 777 (N.D. Ind. April 30, 2010) ....................................... 34

*Turner v. Anheuser-Busch, Inc.*,
   7 Cal. 4th 1238 (1994) ........................................................................... 33

*U.S. ex rel. Themmes v. Hamilton Enterprises, Inc.*,
   No. 04-C-700, 2005 WL 1268784 (E.D. Wis. 2005)........................................................ 26, 27

*United States ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996)................................................................................. 19, 20

*United States ex rel. Ramseyer v. Century Healthcare Corp.*,
   90 F.3d 1514 (10th Cir. 1996)................................................................................. 25

*US ex rel. Erickson v. Uintah Special Services Dist.*,
   No. 2:02CV581DAK, 2007 WL 81806 (D. Utah 2007)........................................................ 29

## Statutes

31 U.S.C. § 3730(h) ...................................................................................................... 1

20 U.S.C. § 1094(a)(20)............................................................................................... 24

## Rules

34 C.F.R. § 668.14(b)(22)(ii)(A) ................................................................................. 24

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Jason Halasa was the College Director for Defendant ITT Educational Services'
Lathrop, California ITT Technical Institute School for *only six months*.  As College Director, he
held the highest position at the school and was responsible for all functional areas.  ITT
terminated Halasa because a significant number of incidents over a short period demonstrated
that he lacked the leadership and judgment to lead the school.  Halasa claims he was terminated
in retaliation for allegedly making various complaints.  His lawsuit alleges: (1) violation of the
anti-retaliation provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and
(2) wrongful termination in violation of public policy under California law.  ITT strongly denies
that he made any of the alleged complaints at any time before his termination or that there is any
merit to his allegations, but even taking everything he says as true, both claims fail as a matter of
law for each of the following distinct reasons.

First, Halasa cannot establish a prima facie case of retaliation because he cannot show
that: (1) he engaged in protected activity or (2) ITT had knowledge of any alleged protected
activity.  In order to show that he engaged in protected activity, he must prove that he in good
faith believed—and a reasonable employee in similar circumstances would have believed—that
ITT was committing fraud on the government.  Halasa cannot make this showing.  The law is
clear that reporting vague speculation is not protected activity.  And yet speculation is all that
Halasa has.  He admits he has no personal knowledge of any unlawful conduct that could support
a FCA *qui tam* action or false reports to the government by ITT.  He further admits that his
purported belief is based entirely on vague rumors and unsubstantiated assumptions by third
parties, all of which he *merely assumed* were true without *any* investigation (in violation of his
duties as a College Director and local Compliance Officer).

1

Equally fatal to his prima facie case is Halasa's inability to prove that ITT had knowledge of his alleged complaints.  Significantly, none of the four people who participated in the termination decision knew of his alleged complaints--Halasa admits he did not communicate any purported concerns to them and there is no evidence that they learned from other sources.  Regardless, his alleged complaints would not have put ITT on sufficient notice of his intentions.  The heightened "fraud alert employee" notice standard applies here because, by his own admission, as College Director and Local Compliance Officer it was his job to report, investigate and take appropriate action if he became aware of unlawful or unethical conduct.  Accordingly, it would not have been enough for him to have reported alleged unlawful conduct, because that was his job.  To state a prima facie case as a "fraud alert employee," Halasa would have needed to tell ITT that he actually intended to bring a FCA *qui tam* action or report ITT's alleged conduct to the government, which he admits he never did.  Because he cannot establish a prima facie case, the burden never shifts to ITT to articulate a legitimate, non-retaliatory reason for termination and summary judgment must be granted.

Even if Halasa could establish a prima facie case, his retaliation claim still fails because he cannot show that ITT's legitimate, non-retaliatory reason for termination is pretext for retaliation.  Halasa has no evidence to dispute that the school was underperforming and needed strong leadership, that each of the underlying incidents that led to Halasa's termination occurred, that ITT made a reasoned determination that these incidents demonstrated a lack of judgment and leadership, and that these concerns prompted his termination.  Neither Halasa's personal belief that ITT made a bad decision terminating him nor his speculation as to ITT's motives is sufficient to establish pretext.

For all of these reasons, ITT requests that summary judgment be entered in its favor.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**A.**   **As The College Director, Halasa Was Also the "Local Ethics And Compliance Officer"**

1.   As College Director, Halasa was also the "Local Ethics and Compliance Officer" for his school.  Halasa Dep. 237:2-22.

2.   It was part of Halasa's duties to make sure that the Lathrop school and employees were in ethical and legal compliance and to report, investigate and take appropriate action if he became aware of unlawful or unethical activity at his school.  Halasa Dep. 237:2-22, 239:8-240: 5, 490:24-491:12, Ex. 20 at § 4; Simich Dep. 206:15-207:1.

**B.**   **Upon Accepting His Position As The College Director, Halasa Knew That The Lathrop School Was Underperforming And Needed Strong Leadership**

3.   ITT, headquartered in Carmel, Indiana, operates ITT Technical Institute schools offering associate and bachelor degree programs.  Each school is managed by a College Director, who oversees five managers, each responsible for a different functional area: Director of Career Services, Registrar, Dean, Director of Finance, and Director of Recruiting.  Declaration of Nina Esbin ("Esbin Decl."), ¶ 2.

4.   Halasa was the College Director of the Lathrop, California school for six months, from March 9, 2009 to September 9, 2009.  Halasa Dep. 12:12-25, 14:23-15:7, Ex. 2.

5.   As the College Director, Halasa was the highest-level ITT employee at the school and was ultimately responsible for all functional areas of the school.  Halasa Dep. 17:5-25.

6.   Halasa reported to Jeff Ortega, District Manager, who reported to Barry Simich, Vice President of Operations, who reported to Gene Feichtner, Executive Vice President and

President of ITT Technical Institute, who reported to Kevin Modany, Chief Executive Officer. Halasa Dep. 18:2-9; Simich Dep. 21:19-20, 25:15-16, 29:8-15; Esbin Decl., ¶ 4.

7.      Halasa reported directly to Simich after Ortega resigned in mid-August.  Halasa Dep. 19:1-3; Simich Dep. 32:16-24.

8.      Halasa acknowledged in an e-mail during the interview process that the Lathrop school was underperforming and that the expectation was that, through strong leadership, he would turn it around.  Esbin Decl., ¶ 3, Ex. A.

**C.    ITT Terminated Halasa's Employment Because A Significant Number Of Events Over A Short Period Of Time Caused ITT To Conclude That He Lacked The Necessary Leadership Skills And Judgment**

**i.      Inappropriate Termination Announcement**

9.      On April 30, 2009, Halasa sent an e-mail to all Lathrop employees publicly announcing a private personnel decision (his decision to fire the Associate Dean) and including religious references in his e-mail ("[W]e . . . pray that God guides him as he makes future decisions").  Halasa Dep. 463:9-19, Ex. 41; Urschel Dep. 130:18-131:14.

10.     Ortega counseled Halasa to state only that an employee "no longer works for ITT" and to refrain from using religious references.  Halasa Dep. 463:23-465:5; Urschel Dep. 132:7-13; Declaration of Mark Urschel ("Urschel Decl."), ¶ 2, Exs. B and C.

11.     Halasa testified at his deposition that his response to ITT's coaching was, "I told them to shut their mouth and I didn't see any problem with mentioning God's name. . . . And I wasn't nice in my response, by the way."  Halasa Dep. 463:23-465:21.

12.     ITT viewed Halasa's April 30 e-mail as inappropriate and concluded that he showed poor leadership and judgment in sending it.  Simich Dep. 49:5- 51:7.

### ii.      Concerns During Operational Review

13.      ITT conducts "operational reviews" of its schools, during which headquarters visits the school, reviews data, and interviews managers in order to assess the school's performance.   Simich Dep. 62:3-20.

14.      After visiting Lathrop for an operational review in mid-May 2009, Simich recalls that Feichtner told him that he thought Halasa was not "as engaged as we would like to see a college director at that point" and that he had not adequately prepared his managers.   Simich Dep. 60:5-61:19.

15.      Feichtner also told Simich that he questioned Halasa's judgment in closing down all of the bathrooms simultaneously during the remodel and sending everyone to a restaurant up the street to use the restrooms.   Urschel Dep. 159:6-160:11.

### iii.      Ethics Alert Line Complaints Against Halasa

16.      ITT has an ethics alert line system ("EAL"), which is a toll-free telephone number that employees can call 24 hours per day, seven days per week to report—anonymously if they wish—any concerns or questions.   Carpentier Dep. 74:4-15.

17.      On June 1, 2009, ITT received two EAL complaints about Halasa.   ITT investigated and substantiated each of the following allegations[1] (and Halasa admitted in his deposition that they were true): (1) Halasa admitted to referring to himself as the "King" and was counseled to stop because others may find it offensive, (2) he admitted to checking on employees and assuming that, if they were not in their offices between 3 pm and 4 pm, they were not

---

[1] There were several other allegations that ITT was not able to substantiate and therefore did not factor into ITT's assessments with respect to Halasa's judgment and leadership.

working and was counseled to use a better approach that would not foment a negative working

environment, (3) Halasa admitted to asking another employee to help him with an e-course and

was counseled that it created a perception that he was improperly asking employees to do his

work, and (4) Halasa admitted to smoking a hookah pipe with caterers in the school parking lot

during a student orientation event (and says that students saw him and asked if they could smoke

with him to which he replied, "No, we can't.  There's just one pipe.") and was counseled that

ITT headquarters is conservative and to be aware that it may create the impression that he is

smoking something illicit.  Urschel Dep. 246:19-250:17; 254:9-255:9, 260:7-261:20, 281:25-

282:9, 304:17-23, 308:21-310:7, 337:19-338:2, 339:13-15; Exs. 201, 202, 205; Halasa Dep.

253:20-268:2, 271:14-272:21; Simich Dep. 80:1-7, 80:17-25.

     18.     While ITT concluded that his conduct did not violate any written policies, ITT felt

that his actions raised serious concerns about his judgment and abilities to lead the campus.

Simich Dep. 100:5-17.  Halasa's actions prompted Simich and others to conclude that "it just

doesn't appear to be the right touch that you would expect [from] someone that is leading

people."  Simich Dep. 80:1-7, 88:8-25, 91:6-15, 99:19-100:17, 105:2-16, 110:12-14, 124:2-16;

Urschel Dep. 247:14-250:17, 260:7-261:20.

### iv.     Lack of Leadership Over Recruitment

     19.     Another factor that led to the termination decision was ITT's assessment that

Halasa lacked judgment and leadership in dealing with problems in the recruitment department,

which recruits prospective students and is vital to the school's growth.  Simich Dep. 147:11-20.

The Director of Recruitment ("DOR") oversees a staff of recruitment representatives, who are

responsible for on-site recruitment and customer service activities, including identifying,

interviewing, and facilitating candidates for enrollment at ITT.  Esbin Decl., ¶ 5.

20.     Two problems surfaced in recruitment in late July 2009, shortly after the DOR went on leave: (1) the recruitment representatives were accusing each other of taking their leads (potential students), causing morale problems, and (2) many of the representatives were underperforming and the school was not on track to meet its enrollment goals for the upcoming September 2009 quarter.  Halasa Dep. 17:5-20, 280:23-25, 281:19-21.

21.     ITT expected Halasa to take a more active leadership role in recruitment in the absence of his DOR and to manage these issues.  Simich Dep. 147:11-150:6.

22.     ITT sent Bob Menszer, a Manager of Recruitment at another school, to help Halasa investigate the lead allegations and provide support and Valory Hemphill, Regional Director of Recruitment, to help train and manage the recruitment representatives on their performance.  Urschel Dep. 196:13-17; Simich Dep. 147:24-148:18.

23.     ITT investigated complaints that one of the recruitment representatives, Nichole Gutierrez, was unfairly taking other representatives' leads (allegedly with the assistance of Records Coordinator Stephanie Norris), concluded there was no evidence to substantiate the claims, and closed the investigation.  Urschel Decl., ¶ 3, Ex. C.  The results and closure of this investigation were communicated to Halasa; ITT expected Halasa to provide leadership to help the representatives move past these issues.  Urschel Decl., ¶ 3.

24.     Just days later, ITT began receiving reports from Hemphill indicating that Halasa continued to bring up lead allegations in front of the representatives.[2]   Declaration of Barry Simich ("Simich Decl."), ¶ 3, Exs. B-D.

25.     Two weeks later, Gutierrez filed a hotline complaint alleging that Halasa and the representatives had humiliated her by raising the same unsubstantiated allegations about her stealing leads in a meeting with all of the representatives.  Urschel Dep. 315:1-10, Ex. 204.  This episode caused Gutierrez to take a leave of absence.  Urschel Dep. 321:18-24.

26.     John Hawthorne, Hemphill's boss, and Simich exchanged e-mails documenting their doubts about Halasa's leadership and ability to turn the recruitment department around in light of the reports that Halasa kept bringing up the lead allegations and did not appear to be managing the performance issues.  Simich Dep. 208:15-210:10; Simich Decl., ¶ 4, Ex. E (Simich wrote: "I have a suspicion the Director may be the root of the issue.").  Their concerns became particularly acute in mid-August after they learned Ortega was resigning and would not be there to guide Halasa.  Simich Dep. 34:24-36:2.  Hawthorne e-mailed Simich on August 19, "Lathrop is out of control and with Jeff out of the picture it is only going to get worse.  Valory is back out there and the reps and the director continue to display bizarre behavior and very poor production with no accountability."  Simich Decl., ¶ 5, Ex. F.

27.     Hemphill also learned that the representatives had not been held accountable for their poor performance, which ITT concluded was another example of Halasa's failure to function as a leader and to address problem areas.  Hemphill Dep. 105:19-107:3; Simich Dep.

---

[2]  If Halasa had new information about the lead issues, ITT would, of course, have expected him to follow up, but to do so in a way that was appropriate to the circumstances and not further disruptive to the fragile morale of the department.

176:4-178:10, 189:17-20.  On August 19 and 20, Halasa, Hemphill, and Menszer counseled several of the underperforming representatives.  Hemphill Dep. 143:11-22, 158:2-7, Ex. 82.

> **v.      Mafia References**

28.     In late July during the investigation into the lead allegations, Halasa referred to Gutierrez and others as "the mafia" in discussions with Information Systems employees at ITT headquarters and was told, "We don't use this word."  Halasa Dep. 186:8-187:8.

29.     ITT felt that his choice of the emotionally-charged term "mafia" demonstrated poor judgment and lack of professionalism.  Simich Dep. 200:13-202:8.

> **vi.     Failure to Manage the Career Services Department**

30.     In early August, around the same time ITT identified the concerns with Halasa's leadership over recruitment, ITT also identified concerns with his leadership over the career services department, which helps graduates find jobs and is critical to the success of the school.  Simich Decl., ¶ 6.

31.     The Lathrop Director of Career Services ("DOCS") went on maternity leave shortly after Halasa started and never returned.  Halasa promoted Tamara Leonard, a staff employee, to Interim DOCS and ultimately to DOCS in mid-August.  Halasa Dep. 554:20-24.  ITT expected Halasa to take a more active leadership role while the Career Services department was in transition.  Simich Dep. 164:11-20, 167:15-169:10.

32.     In July/August 2009, ITT conducted a nationwide career services review and closely scrutinized career services at all schools.  Simich Decl., ¶ 6.  Halasa and Leonard gave a presentation to the CEO, during which ITT believed that they came across as underprepared.  Urschel Dep. 348:3-17.  Leonard also submitted job placement data, which showed a low level of activity for the Lathrop campus.  Urschel Dep. 343:17-344:15, Ex. 209.

33.     On August 3, the CEO e-mailed that the Lathrop performance was "very, very, very underwhelming and disappointing" and instructed Ortega to counsel Halasa. Simich Dep. 167:21-169:10; Simich Decl., ¶ 6, Ex. G. The CEO wrote "I would not mix words on this" and "[t]his is about EXECUTION . . . and it's not happening right now!" Urschel Dep. 343:17-344:15, Ex. 209. Ortega copied Simich on an e-mail back to the CEO on August 5 stating that he had counseled Halasa about taking "personal ownership and becoming personally accountable for the results." Simich Decl., ¶ 6, Ex. G.

### vii.     "Marginal" Audit Score

34.     On August 7, 2009, the Lathrop school received a "marginal" score on its annual internal audit. Halasa Dep. 233:18-234:6.

35.     ITT viewed the Lathrop school's marginal score as reinforcing the continuing need for strong leadership at Lathrop, which raised concerns because ITT felt it was not seeing strong leadership from Halasa. Simich Dep. 129:3-130:2, 133:22-135:9, 138:2-24.

36.     The CEO wrote Halasa "to let you know how disappointed we were with the results of the 2009 Internal Audit" and "[i]t is our expectation that as the leader of the College you will direct your immediate attention to correcting each of the operating issues noted as a concern within your report." Halasa Dep. 235:12-20, Ex. 19.

### viii.     Lack of Preparation for Call with Simich

37.     District Managers hold weekly status calls with each of their schools, during which the schools report on their recruitment efforts, graduate job placements, etc. Halasa Dep. 20:1-21:25; Simich Dep. 32:7-33:7.

38.     Simich led one of these calls with Halasa, Menszer, and Leonard in late August, when Simich was filling in after Ortega resigned. Halasa Dep. 20:1-24:25. Simich expected

Halasa to be knowledgeable regarding the enrollment and job placement data in light of the fact his DOR was on leave, he had a new DOCS, and he had recently been directed to take ownership and improve the school's performance in those areas.  Simich Dep. 147:8-152:2.

39.     Halasa was informed in advance of the call that Simich was going to be on the call and ask about recruitment and career services data.  Halasa Dep. 21:5-23:10.

40.     Halasa admitted that Simich "wasn't impressed" because "[his managers] weren't prepared at all."  Halasa Dep. 22:5-24:21; Simich Dep. 147:8-152:2; Urschel Dep. 156:6-18.

41.     ITT viewed Halasa's lack of preparation for the call--coming on the heels of the April 30 e-mail regarding the Associate Dean and its religious references, the operational review, the two ethics alert line complaints, the mafia reference, the problems in recruitment and career services, and the marginal audit score—as unacceptable.  Simich Dep. 146:9-150:6.

**ix.     Termination Decision**

42.     For all of these reasons, Simich concluded that Halasa lacked the necessary judgment and leadership skills and that new leadership was needed.  Simich Dep. 146:9-150:6.

43.     Simich made the recommendation in late August 2009 to terminate Halasa's employment, which Feichtner, Modany, and Nina Esbin, Senior Vice President of Human Resources, all approved.  Simich Dep. 164:11-20, 165:17-166:10; Urschel Dep. 125:16-22.  ITT began processing the termination paperwork on August 31.  Urschel Decl., ¶ 4, Ex. D.

44.     Simich met with Halasa on September 9, notified him of his termination, and gave him a memo explaining that the school had lost confidence in his ability to lead the college to success.  Halasa Dep. 25:25-26:5, 249:16-25, Ex. 22.

45.    Halasa admits that no one ever told him that he was terminated for any reasons other than those set forth in the September 9 memo and that no one ever made any derogatory comments to him about his alleged complaints.  Halasa Dep. 242:7-243:14; 248:1-23.

**D.    Halasa's Alleged Complaints**

46.    Halasa alleges that his employment was terminated because of complaints he claims to have made regarding five topics: (1) grades and attendance, (2) placement tests, (3) Graduate Employment Information ("GEI") forms, (4) recruitment representative compensation, and (5) document destruction.  Complaint [Dkt #1].

**i.    Grades/Attendance**

47.    Halasa alleges that Bill Robinson, the Registrar and later the Dean, told instructors and department chairs that certain students "must pass" their classes to graduate, which Halasa claims they interpreted as pressure to give students grades and attendance they did not earn, and that Robinson improperly asked ITT headquarters to give Stephanie Norris Registrar-level access to student records when he became Dean (and the Registrar position became vacant) without first getting Halasa's permission.  Halasa Dep. 57:10-14; 59:13-61:15; Pl.'s Fourth Suppl. Rog. Rsps. at p. 1-3 [Rsp. to Rog. 8].

48.    Halasa claims that he reported these concerns to Mark Urschel, Ortega, and Chris Carpentier.  *Id.;* Halasa Dep. 83:15-84:11, 213:16-214:6.  He admitted that he never raised the issue of improper grade changes with anyone at headquarters.  Halasa Dep. 536:5-7.

49.    Halasa's alleged belief is based solely on rumors he claims to have heard from third parties.  Halasa admits he has <u>no evidence</u> that any student records contain inaccurate grade or attendance information.  Halasa Dep. 72:1-6; 533:10-23.  He also admits that he <u>never saw</u> Robinson improperly change a student record, he <u>cannot name</u> a single student whose grades or

attendance records were improperly changed, he <u>never heard</u> Robinson direct an instructor to give student grades or attendance they did not legitimately earn, and he has <u>no evidence</u> that any instructor ever did so.  Halasa Dep. 65:4-14, 67:4-13, 68:20-69:1, 541:21-542:4.

50.     Halasa <u>never took</u> any steps to investigate any of these allegations.  He <u>never asked</u> for the names of students whose records might have been changed, courses, dates, etc. or checked any student records despite the fact that he, as College Director, had authority to access the resources to do so--and it would also have been his job to do so if he truly believed the student records were inaccurate.  Halasa Dep. 535:19-536:4.

51.     ITT deposed two of Halasa's alleged "sources"--Cathy Dalsis, Associate Dean of General Studies, and John Bell, then Chair of the IT Department--who both testified that they never heard Robinson say anything in meetings that they took as a directive to give students unearned grades or attendance and they were not aware of any instance in which unearned grades or attendance were recorded.  Bell Dep. 81:2-22; Dalsis Dep. 35:22-36:18, 155:25-157:4..

**ii.     The Wonderlic Placement Test**

52.     Prospective students must pass the Wonderlic test, among other requirements, to enroll at ITT.  If applicants fail the first time, they can take the test up to three times in one year. ITT uses the Wonderlic test internally as part of its admission process, but does not report the externally outside ITT.  Declaration of Lisa Burr ("Burr Decl."), ¶ 3.

53.     Halasa alleges that one of the representatives, John Thompson, showed him a report containing applicant Wonderlic scores; noted that some of the applicants doubled their scores when they retook the test, which he did not think was possible; and concluded that Norris must somehow be helping these applicants cheat on the test to help her representative friends (such as Gutierrez) increase their enrollments.  Halasa Dep. 101:13-102:15, 106:5-16, 569:8-

570:5.  Halasa claimed to have shown the report to two other representatives, Dean Harris and

Adela Avila, who he claims shared Thompson's view.  Halasa Dep. 106:17-107:11.

54.     Halasa claims he reported these vague concerns and doubts about the accuracy of

the Wonderlic test results to Urschel, Ortega, Carpentier, Menszer, and Hemphill.  Halasa Dep.

114:12-24, 116:12-25, 117:23-118:25; Pl.'s Fourth Suppl. Rog. Rsps. at p. 5-7 [Rsp. to Rog. 18].

55.     Halasa admits that he <u>does not know</u> of any applicant whose test scores were

actually changed and that <u>no one ever told him</u> that they saw Norris improperly change a test

score or help an applicant cheat.  Halasa Dep. 94:10-12, 105:4-12, 108:5-10.

56.     Halasa also admits that he <u>has nothing</u> other than speculation to support his belief

that it is impossible for an applicant to double his score.  Halasa Dep. 116:1-11.

57.     Halasa <u>never took</u> any steps to investigate, despite the fact that he, as College

Director, not only had access to the resources to do so, but it would also have been his job to do

so if he truly believed test scores were not accurate.  Halasa Dep. 119:14-20.

58.     In fact, the Wonderlic test is created, maintained, and scored by an independent,

third-party company, not by ITT.  Burr Decl., ¶ 2.  Applicants generally take the test directly on

the computer and the test is automatically scored electronically by Wonderlic—Norris does not

score the tests and would not have access to the Wonderlic system to change the results.  Burr

Decl., ¶ 5.  Wonderlic then sends the results electronically to ITT, and ITT retains a copy for its

files.  Burr Decl., ¶ 5.  Halasa never pulled any Wonderlic test results to compare them against

ITT's records.  Halasa Dep. 119:14-20.

59.     Halasa wrongly assumed that Norris was the only one proctoring the Wonderlic

exams.  Many other employees were authorized to administer the exam and did so.  Burr Decl., ¶

7, Declaration of Susan Montgomery ("Montgomery Decl."), ¶ 2, Ex. A.  Various reports (all of

which Halasa had access to as Director) show that test scores doubled from time to time when other proctors administered the test.  Burr Decl., ¶ 8, Exs. A-B; Montgomery Decl., ¶ 2, Ex. A.

60.    For an applicant repeating the Wonderlic exam, doubling his or her score is not impossible or inherently problematic.  Burr Decl., ¶ 4.

61.    ITT deposed the representatives who Halasa identified as allegedly sharing his concerns about the scores, Thompson and Harris.  Thompson admits that the allegations were "just hearsay."  Thompson Dep. 140:11-16.  Dean Harris testified that it is possible for applicants legitimately to double their scores.  Harris Dep. 105:12-18.

### iii.    Job Placement Figures – GEI Forms

62.    ITT asked graduating students to complete a GEI form, which collects information about their future employment.  Declaration of Amy Rusiloski ("Rusiloski Decl."), ¶ 2.  The GEI form asks for the student's background information, the employer's information, whether the graduate is utilizing skills and knowledge taught in ITT's core courses of study, and if so, what percentage of their time on the job utilizes such skills.  Rusiloski Decl., ¶ 2, Ex. A.

63.    Halasa alleges that Lathrop career services employees pre-populated the GEI forms to overstate the percentage of time spent utilizing their ITT education on the job before presenting the forms to the students for signature; that Melanie Papke, one of the career services employees, was asked to enter graduate employment data into ITT's internal computer database prematurely before the information was finalized; and that career services staff felt pressure to reach job placement goals and were told to be creative with the GEI forms.  Halasa Dep. 156:11-157:15; 158:16-159:8.  Halasa claims that he reported his concerns to Ortega.  Halasa Dep. 158:7-20; Pl.'s Fourth Suppl. Rog. Rsps. at p. 3-5 [Rsp. to Rog. 13].  He admitted at his

deposition that he does not remember alerting anyone at headquarters about any concerns about graduate employment information being inaccurate.  Halasa Dep. 557:23-558:2.

64.     Halasa admits that he is <u>not aware</u> of any student who actually signed and submitted a GEI form that contained inaccurate information.  Halasa Dep. 556:22-557:9.  Papke testified at her deposition that while she thought she was asked to enter graduate employment data into ITT's internal computer database prematurely, she admits that she never entered graduate employment data that she thought was inaccurate.  Papke Dep. 79:9-18.

65.     Halasa admits that as the College Director, his signature was required on every GEI form before it could be finalized and concedes that he was <u>never presented</u> with and <u>never approved</u> a GEI form that he believed contained inaccurate information.  Halasa Dep. 153:1-3, 153:16-20; Rusiloski Decl., ¶ 4, Ex. B.

66.     Halasa <u>never asked</u> for the names of any students about whom he may have had concerns and <u>never went back and double checked</u> any GEI forms.  Halasa Dep. 156:20-157:11, 159:18-160:3, 162:13-19.

67.     ITT personnel are permitted to "pre-populate" the background sections of the GEI forms in order to streamline the process, but the graduates are supposed to review the information before signing the form.  Rusiloski Decl., ¶ 3.

68.     ITT headquarters periodically audits the GEI forms and pulls the graduate employment information from its system if there is any uncertainty about the accuracy of the data before reporting any graduate data outside ITT.  Papke Dep. 64:17-25; 69:5-10.

69.     Angelo Ponce, one of the recruitment representatives who also was a student at ITT, is the only student whose name Halasa remembered as allegedly being presented with a pre-populated GEI form.  Halasa Dep. 147:1-148:4.  However, Halasa admits that he never followed

up to determine whether Ponce signed the pre-populated GEI form, and Ponce confirms that he did not.  Halasa Dep. 148:15-25; Ponce Dep. 108:1-109:14.

### iv.    Recruitment Representative Compensation

70.    Halasa alleges that ITT's recruitment representatives were unlawfully compensated because he claims that the amount of their compensation was improperly linked to the number of students they enrolled.  Halasa Dep. 119:21-120:1.  Halasa asserts that he reported his concerns to Ortega, Urschel, Carpentier, Hemphill, and Menszer.  Halasa Dep. 131:6-14; Pl.'s Fourth Suppl. Rog. Rsps. at pp. 8-9 [Rsp. to Rog. 23].

71.    The only basis for his alleged belief that the representatives were unlawfully compensated is his belief that one of the representatives, Gutierrez, enrolled more students than other representatives, and she was paid a higher salary.  Halasa Dep. 126:15-21.

72.    It is undisputed that ITT representatives are paid in accordance with ITT's Representative Compensation Plan, which sets forth four factors on which compensation is based and thus provides that representatives are not paid based solely on their enrollment numbers. Halasa Dep. 138:11-16; Rabb Dep. 59:20-60:2, 61:12-21, Exs. 168-169.

73.    Paula Rabb, (ITT's Director of Compensation and Benefits), Hemphill, and five former representatives all testified that representatives are not paid based solely on enrollments. Rabb Dep. 64:13-65:3; Hemphill Dep. 30:5-10; Harris Dep. 37:1-18; 39:7-41:18; Ponce Dep. 38:22-40:24; Heredia Dep. 48:13-50:4; Roberts Dep. 64:14-66:17; Thompson Dep. 55:2-56:8.[3]

---

[3] While Halasa also alleges that he complained that Gutierrez was improperly taking leads from other reps, such a complaint would not be protected activity because, even if it were true, at best, he would have reported an alleged violation of ITT's internal practices, not the FCA.  *U.S. ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.,* No. 03 C 2750, 2008 WL

[Footnote continued on next page]

### v.      Document Destruction

74.     Halasa claims to have heard from contractors that they were asked to dispose of boxes containing ITT documents.  Halasa Dep. 169:18-170:18.

75.     Halasa admits he does not remember ever reporting his alleged concern regarding "document destruction" to anyone at ITT.  Halasa Dep. 174:13-21.

76.     Halasa also admits that he did not look in the boxes to see what documents were getting discarded and thus has no evidence that it would have been improper to do so.  Halasa Dep. 171:5-17; 173:15-17.

### E.      Halasa's Representations That The School Was In Compliance

77.     ITT required Halasa periodically to make representations in writing about the school's legal and ethical compliance and adherence to ITT's policies.  Esbin Decl., ¶ 7.

78.     On April 8, 2009, Halasa signed a certification stating that the school was "in compliance with the requirements of the PPA, ACICS, and State laws," which he believed at the time to be true.  Halasa Dep. 239:8-240: 5, Ex. 20.

79.     He signed an identical certification on July 8, 2009.  Def.'s RFA Nos. 14 and 15 at p. 5; Pl.'s Rsps. to RFA Nos. 14 and 15 at p. 7.

80.     In late July 2009, ITT's internal auditors sent Halasa a draft internal audit report identifying policy violations regarding the documentation of grade and attendance changes and GEI forms and asking him to provide an explanation as to the "cause" and a "college action

---

[Footnote continued from previous page]
4371323, at *2 (N.D. Ill. 2008) ("The Seventh Circuit has made it clear that an employee's complaints about internal improprieties . . . do[es] not amount to FCA-protected activity.") (*citing Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.,* 277 F.3d 936, 944-45 (7th Cir. 2002); *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir. 1999)).

.

plan" for remedying the problems.  Halasa Dep. 222:1-18, Ex. 15.  While Halasa claims to have

known about some or all of the alleged wrongdoing at the time he sent his written response on

August 6, he does not mention any of his alleged complaints that form the basis for this lawsuit.

Halasa Dep. 223:20-224:5, Ex. 16; Pl.'s Third Suppl. Rog. Rsps. at pp. 1-2 [Rsp. to Rog. No. 4],

Pl.'s Second Suppl. Rog. Rsps. at pp. 5, 8-9, 12 [Rsp. to Rogs. 9, 14, and 19].

**F.     Had Halasa Still Been Employed, ITT Would Have Terminated Him On
        October 14, 2010 When ITT Learned That He Was Signing GEI Forms With
        A "Rubber Stamp" Without Even Reading Them**

81.     ITT requires a College Director's signature on GEI forms as an extra layer of

"checks and balances" verifying the accuracy of its job placement data.  Rusiloski Decl., ¶ 4.

82.     Halasa admitted at his deposition on October 14, 2010 that he was routinely

approving GEI forms with a "rubber stamp" without verifying that the proper procedures had

been followed and that the job placement information appeared accurate (he was not even

reading them before signing them).  Halasa Dep. 559:4-18.

83.     Had Halasa still been employed when ITT learned he was not even reading the

GEI forms before signing them, ITT would have terminated him.  Simich Decl., ¶ 7.

**III.    THE RETALIATION CLAIM UNDER SECTION 3730(h) OF THE
         FALSE CLAIMS ACT FAILS AS A MATTER OF LAW**

Retaliation claims under the FCA are analyzed under a three-step burden shifting process

borrowed from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  *See Scott v.*

*Metropolitan Health Corp.,* 234 Fed. Appx. 341, 346 (6th Cir. 2007).  Plaintiff bears the initial

burden of establishing a prima facie case that: (1) plaintiff was engaged in conduct protected

under the False Claims Act, (2) the employer knew that the plaintiff was engaging in such

conduct, and (3) there was a causal connection between the protected activity and the adverse

action taken against plaintiff.  *Neal v. Honeywell, Inc.*, 942 F. Supp. 388, 396 (N.D. Ill. 1996);

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

If, and only if, the employee establishes a prima facie case, then the employer must

produce some evidence of a legitimate, non-retaliatory reason for the termination.  *Scott*, 234

Fed. Appx. at 346.  Plaintiff can then avoid summary judgment only by providing "sufficient

evidence" that the legitimate reasons were a pretext for discrimination.  *Id*.  If the plaintiff fails

to establish any element of his prima facie case, the burden never shifts to the employer to

articulate a non-retaliatory reason and judgment must be entered for the employer.  *See Hopper*,

91 F.3d at 1269 (because plaintiff was not engaged in activity protected under the FCA,

"[j]udgment should have been granted against her as a matter of law").

### A.    Halasa Cannot Establish The First Element Of His Prima Facie Case Because Reporting Mere Speculation Is Not Protected Activity – A Plaintiff Must Have A Reasonable, Good Faith Belief

To be protected activity, the plaintiff must be investigating matters which are calculated,

or reasonably could lead, to a viable FCA *qui tam* action, which by Halasa's own admission was

not the case here.  *Hopper*, 91 F.3d at 1269.  An employee only engages in protected activity if

he in good faith believed—<u>and a reasonable employee in the similar circumstances would have</u>

<u>believed</u>—that his employer was <u>committing fraud on the government</u>.  *Fanslow v. Chicago Mfg.*

*Center*, 384 F.3d 469, 480 (7th Cir. 2004) (emphasis added, citations omitted); *see Neal v.*

*Honeywell, Inc.,* 33 F.3d 860, 864 (7th Cir. 1994), *abrogated on other grounds by Graham Cty.*

*Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005).  The statute

> limits coverage to situations in which litigation could be filed legitimately—that
> is, consistently with FRCP 11.  Then an employee who fabricates a tale of fraud
> to extract concessions from the employer, <u>or who just imagines fraud but lacks</u>
> <u>proof,</u> legitimately may be sacked.  No action is 'to be filed' in either case, and
> employees who use reports of fraud to better their own position, or who behave

like Chicken Little, impose costs on employers without advancing any of the
goals of the False Claims Act.

*Neal*, 33 F.3d at 864 (emphasis added).

Here, Halasa did not have a reasonable, good faith belief that ITT was engaged in
conduct that could support a FCA *qui tam* action.  Halasa admits he had no ***personal knowledge***
of ITT committing fraud on the government (and still does not).  In fact, the only basis for his
belief that illegal activity had occurred at ITT is unsubstantiated, vague rumors that he heard
second-hand (and sometimes third-hand) from other employees that lacked details necessary to
support a reasonable belief.  Rather than investigate, Halasa blindly assumed they were true.  The
vapor-thin nature of these rumors made it unreasonable for Halasa to form hasty conclusions.

His failure to investigate is made even more unreasonable by the fact that Halasa, as
College Director and the highest-ranking employee on campus, had access to all of the resources
he would have needed to investigate these rumors.  Esbin Decl., ¶ 6.  He had or could have
gained access to student records, personnel files, reports, computer files, and any other
documentation.  Esbin Decl., ¶ 6.  All of the Lathrop employees he might have needed to
interview reported directly or indirectly to him and he had access to subject matter experts at ITT
headquarters who could have provided whatever information or additional documentation he
might have needed.  Esbin Decl., ¶ 6.  As College Director and Local Compliance Officer, if he
truly believed Lathrop employees were engaged in unlawful conduct, it would have been part of
his job duties to investigate further.  SOF 2.

More specifically, Halasa lacked a good faith, reasonable belief that ITT was committing
fraud on the government for the following reasons:

- *Grades and Attendance*: Halasa could not have had a good faith, reasonable belief
  that ITT was reporting false grades and attendance to the government.  He has no

evidence that any grades or attendance were inaccurate or changed and he cannot name a single student whose records may be inaccurate.  While Halasa boldly asserts that Robinson said things that instructors took as pressure to give students grades they did not earn, Halasa never heard it himself and his alleged sources testified that they never interpreted Robinson as giving any unlawful directive and that they were not aware of any improper grade or attendance entries.   SOF 47, 49, 51.

- *Wonderlic Placement Test*: Halasa could not have had a good faith, reasonable belief that ITT reported any false scores to the government.  He never investigated and consequently did not know that Norris was not the only one proctoring  these exams, that Wonderlic (not Norris) automatically scores the exams, that the scores in ITT's files are the same as those provided by Wonderlic, and that there is nothing inherently suspect about doubling a score.  SOF 55-60.  Regardless, ITT uses the Wonderlic test internally as part of its admission process, but does not report the scores to the government.  Burr Decl., ¶ 3. *Kennedy,* 2008 WL 4371323 at *2; *Brandon*, 227 F.3d at 944-45; *Luckey*, 183 F.3d at 733.  His speculation and doubts about the accuracy of the results are too vague and conclusory to support of good faith or reasonable belief regarding unlawful conduct, let alone fraud on the government.

- *Job Placement Figures*: Halasa could not have had a good faith, reasonable belief that ITT was submitting fraudulent job placement data to the government.  He cannot name a single student whose GEI form/employment data may be inaccurate and he is not aware of it actually happening.  Moreover, as College Director he had to approve all GEI forms, which ITT headquarters periodically audits before releasing any data, so he had no basis to form a reasonable belief that any false graduate employment

data was ever actually reported outside ITT.  SOF 64-65.  His conclusory allegations that staff felt pressure or was told to be creative are too vague to meet his burden regarding protected activity or notice to ITT as a fraud alert employee

- *Recruitment Representative Compensation*: Halasa's admission that representatives are paid in accordance with ITT's Representative Compensation Plan and that enrollment numbers are not the sole basis for determining a representative's salary is fatal to his claim that he had a good faith, reasonable belief that their compensation violated the federal incentive compensation ban.  That ban prohibits schools from paying "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities."  20 U.S.C. § 1094(a)(20).  On its face, the provision is limited to three discrete forms of compensation--commissions, bonuses and other incentive payments--and does not prohibit or restrict a school from paying a merit-based salary to its representatives. *Id.*  Department of Education ("DOE") regulations further clarify that an academic institution does not violate this provision by paying a salary, or adjusting that salary up or down, provided that the amount of any adjustment is not based "solely" on the number of students enrolled or the number of students whom an employee signs up for financial aid.  34 C.F.R. § 668.14(b)(22)(ii)(A) (July 2010).  Halasa had access to ITT compensation experts at ITT headquarters, who could have explained the requirements, or the DOE.  Esbin Decl., ¶ 6.  He cannot bootstrap his misconception of the law as the basis for a belief that ITT engaged in unlawful conduct.

- *Document Destruction:* Because Halasa admits he never reported his alleged concern regarding "document destruction," it cannot be the basis for retaliation. SOF 75. Regardless, Halasa could not have had a good faith, reasonable belief that ITT was wrongly destroying documents that could support a *qui tam* action because he admits he does not know what documents were being destroyed, whether it was improper to do so, or that it related in any way to the government. SOF 76.

Far from engaging in protected activity, Halasa engaged in sheer speculation. Had Halasa conducted even a cursory investigation, he would have learned that there was no merit to or evidence to support those rumors. Halasa is precisely the kind of plaintiff who "imagines fraud but lacks proof" of which the Seventh Circuit was wary as a "Chicken Little" employee. *Neal*, 33 F.3d at 864. A reasonable employee in similar circumstances could not and would not have believed that ITT was committing fraud against the government.

**B.      Halasa Cannot Establish The Second Element Of His Prima Facie Case Because He Cannot Prove That ITT Had Knowledge Of His Alleged Complaints**

The Seventh Circuit has made clear that unless an employer is aware that the employee has engaged in protected activity, the employer cannot possess the retaliatory intent necessary to establish a violation of Section 3730(h). *Luckey*, 183 F.3d at 733.

**1.      None Of The Four Decision Makers Had Knowledge Of Halasa's Alleged Complaints**

Fatal to his claim is the undisputed fact that none of the four people who made the termination decision – Simich, Feichtner, Modany, and Esbin – knew about any of Halasa's alleged complaints. Simich Dep. 159:1-9; 215:1-216:13; Halasa Dep. 247:7-14. Thus they could not have fired Halasa for making them. Halasa does not claim to have told them and he has no evidence that anyone else told them or that they learned through other means. Pl.'s

Second Suppl. Rog. Rsps. at pp. 2-3, 6-7 [Rsp. to Rogs. 6, 11]; Pl.'s Fourth Suppl. Rog. Rsps.

Halasa's evidence with respect to ITT's knowledge consists solely of his alleged

communications with non-decision makers, which is not sufficient to carry his burden of

showing that ITT had knowledge of his claims.

### 2.   Halasa Cannot Meet the Heightened Notice Standard Applicable to "Fraud Alert Employees"

Halasa also cannot establish a prima facie case because, even if he had complained

exactly as alleged, the form in which he claims to have made his alleged complaints would have

been insufficient as a matter of law to put ITT on notice that he was engaging in protected

activity.  If a plaintiff is a "fraud alert employee"--meaning an employee like Halasa whose job

includes investigating fraud within the company--he must satisfy an even higher burden in terms

of the form of his complaint so that it is absolutely clear that he is not just doing his job, but

rather that he actually intends to bring a False Claims action against the employer or report the

employer's conduct to the government.  *Brandon v. Anesthesia & Pain Management Associates*,

*Ltd.*, 277 F.3d 936, 945 (7th Cir. 2002) (citation omitted).

For example, in *Brandon*, the plaintiff alleged retaliatory discharge.  *Id.* at 938.  While

working at a medical clinic, the plaintiff discovered that certain doctors seemed to be falsifying

their bills submitted to Medicare to get higher reimbursements.  *Id.* at 939.  He brought his

concerns to the shareholders, and was eventually discharged.  *Id.*  The court noted that one of

plaintiff's job duties was to ensure that the billing practices complied with Medicare rules and

regulations.  *Id.* at 945. "Thus, the fact that [employee] was alerting his supervisors to the

possibility of their non-compliance with the [Medicare] rules would not necessarily put them on

notice that he was planning to take a far more aggressive step and bring a *qui tam* action against

them or report their conduct to the government." *Id.*  "Persons whose jobs entail the

investigation of fraud 'must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.'"  *Id*. (quoting *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996)) (emphasis added); *see also Fanslow v. Chicago Mfg. Ctr.*, 384 F.3d 469, 484 (7th Cir. 2004) (only fraud-alert employees had to use "magic words" like "illegal" or "unlawful" to put the employer on notice); *Kuhn v. LaPorte Cty. Comprehensive Mental Health Council*, No. 3:06-CV-317 CAN; 2008 WL 4099883, at *5 (N.D. Ind. 2008) ("Employees charged with discovering fraud in the normal course of their job duties are obligated to a heightened notice requirement, necessitating that the employee indicate an explicit intention to bring a *qui tam* action or otherwise report the fraudulent conduct to the government"); *U.S. ex rel. Themmes v. Hamilton Enterprises, Inc.*, No. 04-C-700, 2005 WL 1268784, at *11 (E.D. Wis. 2005) (motion to dismiss FCA retaliation claim granted because plaintiffs never "mentioned or even alluded to the government in any way, shape, or form, much less fraud on the government or possible litigation").

Here, Halasa was a "fraud alert employee" and thus the heightened notice requirement applied to him.  *See* SOF 1-2.  It is undisputed that Halasa was the Local Compliance Officer for ITT, that as the Local Compliance Officer it was his job to investigate, report, and take appropriate action with respect to any unlawful or unethical activity at his school (which fits squarely within the definition of a fraud alert employee), and that he was doing his job when he made the alleged complaints.  *Id*.

To meet his heightened notice burden, Halasa would have had to make it abundantly clear that he was intending to report the allegedly fraudulent conduct to the government, which he admits he did not do.  While Halasa claims to have reported that certain ITT policies were not

being followed, he admits that he never told anyone at ITT any time before his employment

ended that he had reported or intended to report any concerns about fraudulent activity to any

government body or to file a lawsuit based on alleged fraud on the government.  Pl.'s Rsps. to

RFA Nos. 4 and 5 at p. 4.  Further, a violation of policy or law is not automatically a violation of

the FCA.  Accordingly, even if Halasa had communicated his alleged complaints to one of the

decision makers, as in *Brandon* that alone "would not necessarily put them on notice that he was

planning to take a far more aggressive step and bring a *qui tam* action against them or report their

conduct to the government."  277 F.3d at 945.  Like the plaintiffs in *Themmes*, Halasa never

"mentioned or even alluded to the government in any way, shape, or form, much less fraud on

the government or possible litigation."  2005 WL 1268784, at *11.

    Moreover, if anything, Halasa's communications were inconsistent with any notion that

he ever had concerns about unlawful conduct and conveyed that he in fact believed that the

school was in compliance.  For example, on April 8, 2009, Halasa signed a certification stating

that the school was "in compliance with the requirements of PPA, ACICS, and State laws,"

which he believed at the time to be true.  SOF 78.  He signed an identical certification on July 8,

2009.  SOF 79.  In late July 2009, ITT's internal auditors sent Halasa a draft internal audit report

identifying policy violations regarding the documentation of grade and attendance changes and

GEI forms (nothing related to any of Halasa's alleged concerns) and asking him to provide an

explanation as to the "cause" as well as a "college action plan" for remedying the problems.

SOF 80.  While Halasa claims to have known about the alleged wrongdoing at the time he sent

his written response on August 6, 2009, he does not mention any of his alleged complaints that

form the basis for this lawsuit.  *Id.*  So even if Halasa had informed ITT about his suspicions of

fraud, by sending contrary messages and failing to report these suspicions in response to several

specific requests for him to identify any known violations, Halasa further distanced himself from meeting the higher burden of a fraud alert employee to "make **clear** [his] intentions of bringing or assisting in an FCA action in order to overcome the presumption that [he was] merely acting in accordance with [his] employment obligations." *Brandon*, 277 F.3d at 945 (citation omitted) (emphasis added).

## C.   Even If Halasa Could Establish A Prima Facie Case, He Cannot Establish That ITT's Legitimate, Non-Retaliatory Reason For Termination Is Pretext For Retaliation

Even if Halasa could establish a prima facie case, he cannot meet his ultimate burden of proving pretext. ITT terminated his employment because: (1) a significant number of events over a short period of time demonstrated to ITT that Halasa lacked the judgment and leadership skills to lead the school at a time when there was a particularly acute need for strong leadership and (2) ITT had already counseled him to no avail. Thus, assuming the burden ever shifted to ITT, that showing shifts the burden back to Halasa to produce sufficient evidence that a reasonable jury could find that ITT's stated reason is pretext for retaliation, which he cannot do. Halasa admits that no one ever told him that he was terminated for any reasons other than those set forth in the September 9 memorandum and that no one ever made any comments to him about his alleged complaints. SOF 45.

To establish pretext, Halasa must submit evidence demonstrating a triable factual issue as to whether ITT failed to make a "reasonably informed and considered decision" and thus lacked an "honest belief" in the proffered reason for termination. *Scott*, 234 Fed. Appx. at 346 (citing *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005). Neither his personal belief that he was doing a good job, nor his disagreement with ITT's business judgment to terminate him, nor his belief that ITT should have provided more feedback, nor his conclusory allegations and speculation as to ITT's motive creates a triable factual issue as to pretext.

> [I]t is the plaintiffs' burden to establish that GE's proffered reason for having
> guards follow the plaintiffs around, i.e. to ensure the safety of the plaintiffs, is
> pretext for retaliation.  It is not enough to "simply show that the employer's
> decision was wrong or mistaken, since the factual dispute at issue is whether
> discriminatory animus motivated the employer, not whether the employer is wise,
> shrewd, prudent, or competent."  Instead, "the non-moving plaintiff must
> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the employer's proffered legitimate reasons for its action that a
> reasonable factfinder could rationally find them unworthy of credence, ... and
> hence infer that the employer did not act for the asserted non-discriminatory
> reasons." Id. (internal quotation and markings omitted). Merely contending that
> GE could have done more to protect the plaintiffs or that it could have performed
> a more thorough investigation does not satisfy this burden.

*Boze v. General Elec. Co.*, No. 4:07CV-74-M, 2009 WL 2485394, at *9 (W.D. Ky. Aug. 11,

2009) (internal citations omitted, emphasis added) (summary judgment for the employer in a

Title VII retaliation case).

For example, in *US ex rel. Erickson v. Uintah Special Services Dist.*, the defendant

became more attentive to the plaintiff's work after her alleged complaints, audited her work, and

later terminated her based on the audit report.  No. 2:02CV581DAK, 2007 WL 81806, *1-2 (D.

Utah 2007).  Erickson disagreed with many of the audit findings, but was not given an

opportunity to respond.  *Id.* at *2.  In granting summary judgment for USSD on her FCA

retaliation claim, the court explained:

> In considering the USSD's reliance on the Audit Report in Erickson's
> termination, this court does "not sit as a kind of 'super-personnel department,'
> free to second guess the propriety of an employer's business decision." The
> burden is on Erickson to demonstrate that USSD's stated basis for termination "is
> so weak, implausible, contradictory, inconsistent, or incoherent as to be unworthy
> of belief.

*Id.* at *5 (citations omitted, emphasis added).  Accordingly, it was not necessary for USSD to

defend every conclusion in the audit report because it was prepared by a reliable source and any

of the findings was sufficient grounds for termination.  *Id.*  Even if the audit report contained

inaccuracies, there was no evidence it was fabricated or other evidence to establish pretext.  *Id.*

In *Scott*, the court granted summary judgment to the defendant in a FCA retaliation case after finding that the plaintiff failed to establish pretext:

> If there is no reasonable dispute that the employer made a 'reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

234 Fed. Appx. at 346 (citation omitted, emphasis added). The defendant presented evidence that it made a reasonable, informed, and considered decision to terminate the plaintiff because it "legitimately perceived her to be untrustworthy" based on her alteration of Board minutes and on other complaints. *Id.* at 352. There were many complaints, from diverse sources, and a variety of contexts, adding to their credibility, and the defendant interviewed witnesses, investigated, and corroborated the allegations. *Id.* at 350-52. The plaintiff never apologized and there were no signs of improvement or the complaints tapering off in terms of number or severity. *Id.* at 350. The plaintiff admitted to secretly altering the Board minutes; her attempts to justify doing so were not sufficient to defeat summary judgment and the suggestion that Metro should have investigated her explanations further was "untenable to the point of absurdity." *Id.* at 351.

Halasa may disagree with the termination decision--as every plaintiff who brings a wrongful termination/retaliation claim does. However, he cannot defeat summary judgment by second guessing ITT's business judgment, arguing that ITT's decision-making process fell short of best practices (it did not), or disagreeing with ITT's assessments. Rather, Halasa must show that ITT did not make a "reasonably informed and considered decision" and that the explanation was so implausible to not be credible – a burden he cannot meet. *See Scott*, 234 Fed. Appx. at 346; *Boze*, 2009 WL 2485394 at *9. Even if Halasa disagrees with ITT's assessment, he has no evidence to show that it was so off base so as not to be reasonable. Halasa admits that each of

the underlying incidents occurred.  He has no evidence to dispute that those incidents reasonably

caused ITT to conclude he lacked the necessary judgment and leadership.  He also cannot dispute

that lack of leadership and judgment is legitimate grounds for termination.  As in *Scott*, issues

calling Halasa's judgment into question kept coming up over and over again and concerns were

raised in many different contexts, by many different reliable sources (most of whom Halasa

admits did not know about any of his alleged complaints), which lent further support to the

reasonableness of ITT's concerns.  SOF 9-42.  ITT investigated and corroborated these incidents

(most of which are undisputed) and made a reasonable, balanced assessment.  *Id.*

> While Halasa may feel that it would have been more fair to give him written warnings on

an ITT "Corrective Action" neither the law nor ITT policies require any progressive discipline

before termination.  Urschel Dep. 174:24-176:5, Ex. 185 ("Depending on the situation, however,

ITT may repeat, modify, omit, or employ any corrective action without reference to the levels of

corrective action.  ITT/ESI also reserves the right to terminate employees immediately.")

Regardless, ITT did counsel Halasa repeatedly, both orally and via e-mail.  *See, e.g.*, SOF 23, 31,

36.  The fact ITT took the time to counsel him orally, rather than paper his file with formal

warning documents, if anything, evidences restraint and encouragement rather than retaliatory

motive.  Further, he has no evidence to refute that ITT made a reasoned assessment that these

types of judgment and leadership concerns lend themselves more to the oral counseling that ITT

provided, rather than a written warning.  Simich Dep. 102:3-4 ("I don't know how you do a

corrective action on someone's judgment and leadership.").

> Finally, even if Halasa personally disagrees with ITT's assessment that further counseling

would not have been effective, there is ample evidence supporting the reasonableness of ITT's

conclusion.  For example:

- Ortega counseled Halasa about his language choices, judgment, and perception issues in May (relating to the April 30 e-mail) and in June (relating to the EAL complaints), yet in July he used the term "mafia" to describe his subordinates.  SOF 10, 17, 28.

- Ortega counseled Halasa on July 28 to take control of the representatives after closing the investigation into the allegations that Gutierrez was taking other representatives' leads (to which he responded, "I am taking control"), yet one day later Hemphill reported that Halasa brought up those same allegations in front of the representatives, and two weeks later, Gutierrez filed a hotline complaint that he had allowed the representatives to interrogate her further in a meeting in front of all of the reps.  SOF 23, 24.

- The CEO, Ortega and others counseled Halasa in July to improve career services and recruitment, yet he and his managers were unprepared on a call with Simich in late August to talk about those areas.  *See, e.g.*, SOF 31-33, 37-41.

## IV.   THE CALIFORNIA WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY RETALIATION CLAIM ALSO FAILS AS A MATTER OF LAW FOR THE SAME REASONS

While there are some differences between the FCA and the California state law wrongful termination in violation of public policy claim, they are not material for purposes of this motion. The California claim fails for all the same reasons as the FCA claim.

As with the FCA retaliation claim, to establish a prima facie case under the California claim a plaintiff must show that: (1) he engaged in protected activity, (2) the employer subjected him to an adverse employment action, and  (3) there is a causal connection between the protected activity and the adverse action.  *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 614 (1989).  In addition, he must demonstrate that his termination violated a public policy that is: "(1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional

provision." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1256 (1994) (the "tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others;" vague allegations that a supervisor's conduct also violated Alcohol, Tobacco and Firearms laws was not sufficient to defeat summary judgment).  Only if the plaintiff establishes a prima facie case must the employer articulate a legitimate, non-retaliatory reason. *Hersant v. Dept. of Social Servs.*, 57 Cal. App. 4th 997, 1002-03 (1997).  The burden then shifts to the plaintiff to prove that the reason is a pretext for retaliation.  *Id.* at 1002-03, 1005-09.

**A.      Halasa Cannot Establish a Prima Facie Case of Retaliation**

For all the same reasons Halasa cannot establish a prima facie case under the FCA, he cannot do so for the California claim.

**B.      Halasa Also Cannot Establish Pretext**

For all the same reasons Halasa cannot establish pretext under the FCA, he cannot do so for the California claim.  As under the FCA, a plaintiff cannot establish pretext by showing that his employer made a mistaken or bad business decision in terminating his employment.

> The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

*Id.* at 1005-09 (1997) (citations omitted, emphasis added) (while Hersant raised triable issues as to whether the actions were reasonable and well-considered, he failed to present "substantial responsive evidence" that the stated reasons were so implausible, inconsistent, or baseless to be pretextual; summary judgment for the employer affirmed).

33

## V.      THE "AFTER ACQUIRED EVIDENCE DOCTRINE" LIMITS THE AVAILABLE REMEDIES

The "after acquired evidence doctrine" bars Halasa's request for reinstatement and for lost wages after October 14, 2010, the date of his deposition during which ITT learned that he was routinely approving GEI forms with a "rubber stamp" without verifying that the proper procedures had been followed and that the job placement information appeared accurate.  SOF 82; *see McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362 (1995) ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.  The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered."); *Berg v. BCS Financial Corp.*, No. 04 C 7922, 2006 WL 273541, *11 (N.D. Ill. 2006) (same); *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 710 F. Supp. 2d 777, 810-11 (N.D. Ind. April 30, 2010) (same).  ITT requires a College Director signature on all GEI forms to add an extra layer of "checks and balances" verifying the accuracy of job placement information, which ultimately gets reported externally.  SOF 81.  Had Halasa not been terminated on September 9, 2009, ITT most certainly would have terminated him when it learned that he was <u>signing GEI forms without reading them</u>.  SOF 83.

## VI.    CONCLUSION

ITT respectfully requests that summary judgment be entered because Halasa cannot

establish two essential elements of his prima facie case (protected activity and knowledge by

ITT) or that ITT's legitimate, non-retaliatory reason for termination is pretext for retaliation.

Respectfully submitted,

ICE MILLER LLP

By:  **s/ Philip A. Whistler**

Philip A. Whistler
Philip.whistler@icemiller.com
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, Indiana 46282
Phone: (317) 236-2349
Fax: (317) 592-4790

Elisabeth C. Watson,
Admitted *Pro Hac Vice*
ewatson@gibsondunn.com
Lynn N. Hang,
Admitted *Pro Hac Vice*
lhang@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Phone: (213) 229-7000
Fax: (213) 299-7520

***Counsel for ITT Educational Services, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

John M. Ketcham
PLEWS SHADLEY RACHER & BRAUN LLP
jketcham@psrb.com

Katherine E. Taylor
PLEWS SHADLEY RACHER & BRAUN LLP
ktaylor@psrb.com

Brianna J. Schroeder
PLEWS SHADLEY RACHER & BRAUN LLP
bschroeder@psrb.com

s/ Philip A. Whistler
Philip A. Whistler

ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
317-236-2100

36