# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **JASON HALASA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:10-cv-0437-WTL-MJD** |
| | ) |
| **ITT EDUCATIONAL SERVICES, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## JASON HALASA'S BRIEF IN OPPOSITION TO ITT'S MOTION FOR SUMMARY JUDGMENT

SEALED – SUBJECT TO AGREED PROTECTIVE ORDER DATED OCTOBER 26, 2010

\* \* \*

THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION AND IS NOT TO BE OPENED, NOR ITS CONTENTS TO BE REVEALED, TO ANYONE OTHER THAN AUTHORIZED COURT PERSONNEL OR COUNSEL OF RECORD, EXCEPT BY ORDER OF THIS COURT

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JASON HALASA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:10-cv-0437-WTL-MJD |
| | ) |
| ITT EDUCATIONAL SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

## JASON HALASA'S BRIEF IN OPPOSITION TO
## ITT'S MOTION FOR SUMMARY JUDGMENT

### I.      Introduction

ITT terminated Dr. Jason Halasa because he listened to employees' complaints, investigated those complaints, and put his superiors on notice that he believed there were serious legal and ethical violations at the Lathrop Campus. Now, ITT is constructing an alternate ending to the Halasa story. ITT's story is full of trumped up charges, convenient coincidences, and pre-textual reasons constructed for litigation. ITT would have this Court believe that headquarters was acutely aware of every instance when Dr. Halasa's choice of words was unusual or when he went out for a smoke, but somehow missed that Dr. Halasa believed there was unlawful activity at the Lathrop Campus. In other words, ITT knew enough about Dr. Halasa to fire him, but was careful not to learn about his complaints regarding illegal behavior. This is not believable and Halasa is entitled to test ITT's credibility before a jury.

### II.      Statement of Material Facts in Dispute

ITT sets forth 83 numbered paragraphs of facts it labels "undisputed." This is a gloss. There are few issues of fact *not* in dispute. In reality, there is agreement among the parties on only 26

allegations of fact.[1] Of those 26, none are dispositive—just background facts and statements summarizing Halasa's allegations. Another four (4) paragraphs[2] may be accurate—Halasa is without information to admit or deny—but these facts are immaterial.[3] Sixteen[4] additional paragraphs contain half-truths, but are so tainted with ITT's mischaracterization of testimony and the evidence that they are effectively in dispute. Paragraphs 81, 82 and 83 are interposed to support ITT's trumped up after-acquired evidence argument.

This leaves at least 56[5] paragraphs out of 83 from ITT's Statement of Facts (Doc. 60) in dispute. With his brief in support, Halasa also designates additional evidence that goes to the crux of this case, including: Lathrop employees complained to Halasa of unlawful activity on the campus, Halasa investigated and reported these complaints and was terminated as a result.  As the non-moving party, Halasa is entitled to have these facts construed in his favor. *Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir. 1996). The Court must assume the truth of evidence set forth by Halasa and give him the benefit of all reasonable inferences.  *Frobose v. Am. Savings and Loan Assoc. of Danville,* 152 F.3d 602, 604 (7th Cir. 1998).

### a.  ITT's Incentive to Falsify Information to Maintain Federal Funding

---

[1] ITT Statement of Facts Not in Dispute are ¶¶ 3, 4, 5, 6, 7, 9, 10, 13, 16, 22, 34, 37, 43, 44, 46, 47, 52, 53, 58, 60, 62, 69, 70,  74, 75  and 77. (Doc. 60.)

[2] ITT's Doc. 60 ¶¶ 8, 32, 67, and 68.

[3] Halasa does not dispute the allegation contained in Doc. 60 ¶19 that "[t]he Director of Recruitment ("DOR") oversees a staff of recruitment representatives, who are responsible for on-site recruitment and customer services activities, including identifying, interviewing, and facilitating candidates for enrollment at ITT." Halasa disputes the remaining allegation in Doc. 60 ¶20, in particular that Halasa's alleged lack of leadership in the recruitment department was a "another factor" in ITT's decision to terminate Halasa's employment. Similarly Halasa does not dispute the fact that Lathrop Director of Career Services ("DOCS") went on maternity leave shortly after Halasa started and never returned or that Tamara Leonard was promoted to Interim DOCS contained in Doc. 60 ¶31.  The remaining allegations in this paragraph are in dispute.

[4] Doc. 60 ¶¶ 1, 2, 8, 17, 20, 24, 25, 26, 28, 39, 40, 50, 61, 78, 79 and 80.

[5] Halasa disputes the material issues of fact contained in Doc. 60 ¶¶ 11, 12, 14, 15, 17, 18, 20, 21, 23, 27, 28, 29, 30, 32, 33, 35, 36, 38, 41, 42, 45, 48, 49, 50, 51, 54, 55, 56, 57, 59, 61, 63, 64, 65, 66, 71, 72, 73, 76, and 79.

ITT is a for-profit educational institution based in Carmel, Indiana. ITT receives federal

funds in the form of student aid loans and grants made to eligible students who attend an ITT

school campus. ITT is liable under the False Claims Act and jeopardizes its eligibility for these

federal funds if it compensates its employees based "directly or indirectly upon success in securing

enrollments or financial aid" to a student. 34 C.F.R. § 668.14(b)(22); 31 U.S.C. § 3729. ITT violates

§ 3729 when it "knowingly presents, or causes to be presented, a false or fraudulent claim for

payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim."

ITT must be accredited in order to take advantage of federal funds. 20 U.S.C. § 1001. In

order to maintain its accreditation and its federal funding, ITT must report accurate student grades

to the accrediting association. 20 U.S.C. §§ 1094(a)(21), 1099(j). ITT must comply with many

requirements in order for it to access federal funds; those additional requirements are explained in

the program participation agreement ITT enters into with the United States government. 34 C.F.R.

§ 668.14(a)(1). These program participation agreements require ITT to certify it will provide truthful

graduate employment information, will not compensate employees based on securing student

enrollment, and utilizes a campus security policy, among other things. *See* 34 C.F.R. § 668.14(b).

ITT received approximately 75% of its total cash receipts in 2010 from Title IV federal

funding programs. (ITT 10-K 2010 Annual Filing, attached to Halasa's Desig. of Evid.[6] as Exhibit

XX, at p. 42.) In order to increase revenue, there is widespread pressure on ITT employees to

recruit and retain more students. (Affidavit of Dr. Jason Halasa, Ex. CCC, ¶ 9.) More students equal

a bigger bottom line for ITT. *Id.* The purpose of the FCA whistleblower provision is "to promote

enforcement of the FCA by 'assur[ing] those who may be considering exposing fraud that they are

---

[6] All exhibits are referred to as "Ex. __" and are attached to Halasa's Designation of Evidence in
Opposition to ITT's Motion for Summary Judgment.

legally protected from retaliatory acts.'" *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 343 (4th Cir. 2010) (*quoting* S. Rep. No. 99-345, at 34 (1986)).

"Congress 'recognize[d] that few individuals will expose fraud if they fear their disclosures will lead to…any [] form of retaliation,' and, accordingly, sought 'to halt companies and individuals from using the threat of economic retaliation to silence 'whistleblowers.'"" *Id.* Section 3730(h) creates a cause of action for employees who are retaliated against because they took measures to prevent fraud against the government. *Id.* Congress amended the FCA in 2009 to ensure those who "blow the whistle internally or externally without the filing of a *qui tam* action or who refuse to participate in the wrongdoing" were also protected by the statute. *Fraud and Enforcement Recovery Act of 2009*, 155 Cong. Rec. E. 1295, 1300 (June 3, 2009) (statement of Rep. Berman), Ex. LL.

### b. Halasa Hired as College Director

ITT hired Halasa to be the College Director at the ITT Lathrop Campus on or about March 9, 2009. (Dep. of Dr. Jason Halasa, Ex. A, 14:23–25; 15:5–7.) The school was disorganized, with vacant leadership positions and a massive remodeling project underway that displaced the recruiting department. (Dep. of Gilbert Dean Harris, Ex. B, 31:3–22.) While there was no dean of the school or director of career services, Halasa filled in for those positions as well as performing his own duties. (Halasa Dep. 17:5–20; Dep. of Barry Simich, Ex. D, 164:21–165:16.) The director of recruitment and the director of finance were each out for several months during Halasa's tenure at ITT Lathrop. (*Id.*)

### c. Widespread Complaints Among Lathrop Employees of Unlawful Activity at the Lathrop Campus

ITT's characterization of illegal activity at the Lathrop campus as nothing more than "vapor-thin…rumors" ignores key testimony, not just from Halasa, but from Lathrop employees. Those employees paint a different picture, and corroborate Dr. Halasa's testimony of illegal activity that led him to investigate and complain.

### 1.   Illegal Representative Compensation

Several recruiters, including John Thompson, Dean Harris, and Robert Roberts complained to Halasa that representatives were being compensated illegally based on the number of students they convinced to enroll at ITT.  (Halasa Dep. 119:21–121:3; 122:3–123:23; 125:7–19; 128:13–130:21; Dep. of John Thompson, Ex. E, 120:19–138:1; Harris Dep. at 45:19–47:7; 48:3–13; Dep. of Robert Roberts, Ex. F, 47:19–49:21; 50:14–52:4; 59:10–24.)  Roberts also reported his complaints about the tier system to Julie Shedd, sent from ITT headquarters to conduct an internal audit at Lathrop in 2009.  (Roberts Dep. 47:19–49:21; 50:14–52:4; 59:10–24.)  Roberts' complaint to Shedd was ignored.  (*Id.* 59:10–24; 60:4–61:4.)  Shedd told Roberts that she did not handle those complaints and that instead he should take his concerns to the college director. (*Id.*)  Melanie Papke, a career services coordinator at Lathrop, was aware of these complaints and believed that recruiters were likely being compensated in violation of official ITT policy.  (Dep. of Melanie Papke, Ex. C, 35:20–36:13; 94:3–95:15; 98:22–99:19.)

Representatives also complained about the "Tier System," the method by which student leads, which affected representative compensation, were allocated to different recruiters.  (Harris Dep. 28:7–24; 45:19–47:7; 48:3–13; 64:1–65:15; 66:1–11; 67:4–68:9.)  Harris, Roberts, and Thompson brought their concerns about the Tier System and lead allocation to Dr. Halasa.  (*Id.*; Roberts Dep. 47:19–49:21; 50:14–52:4; Thompson Dep. 44:15–48:12; 51:4–12.)  Harris informed Halasa that one representative, Nichole Gutierrez, had called a student that was on Harris's bank of names.  (*Id.* at 62:13–63:19; *see also* Ex. QQ ("[Harris] is compensated by how many students he enrolls in the school, thus [Gutierrez] took money away from him.")  Janice Heredia, a representative at ITT Lathrop, also brought concerns to Halasa that Gutierrez was taking leads from other representatives.  (Dep. of Janice Heredia, Ex. G, 65:22–68:21.)

Harris and Thompson filed Ethics Alert Complaints ("EAL"), specifically complaining about ITT's lead system. (Exs. SS, RR, QQ, TT, NN.) There was a perception that Gutierrez and Norris were inappropriately funneling leads away from other representatives. (Dep. of Mark Urschel, Ex. H, vol. II 102:17–104:15; Exs. OO, WW, SS, RR, TT, QQ, NN.) There were also issues about Norris and Gutierrez "backdating" IRIS entries.[7] (Simich Dep. 204:10–25; Ex. WW.) Barry Simich, Vice President of Operations, testified that while this compliance issue was "concerning," he did not know if it was investigated and would not get involved in something like that. (Simich Dep. 204:10–205:11.)

ITT was aware of these complaints before Halasa's lawsuit. (Roberts Dep. 52:14–53:6; 54:6–13; 55:1–59:9.) Roberts complained about these issues to Kathy Paradis, Julie Shedd, Mark Urschel, and Chris Carpentier. (*Id.*) The designated evidence shows that Urschel, Carpentier, Modany, Cooper, Esbin, and Clark Elwood (legal counsel) were all aware of the complaints coming from Lathrop regarding representative behavior and lead misallocation. (Exs. PP, RR, TT.)

## 2. Improper Placement Testing

Employees also complained that certain staff members were changing scores on placement tests so that students could attend ITT and obtain federally subsidized aid. (Halasa Dep. 52:8–54:12; 92:12–18.) Halasa discovered a common practice at ITT Lathrop of altering placement test scores in the database and of employees, including Stephanie Norris, Nichole Gutierrez, and Bill Robinson, providing inappropriate assistance during the placement test, sometimes helping a student to double his or her score over night. (Halasa Dep. at 95:25–97:21; 99:18–103:6; Roberts Dep. 133:4–23.) Sometime in July, 2009, Thompson, Roberts, Adela Avila, and Harris complained about the placement tests to Halasa and to other ITT personnel. (Halasa Dep. 104:18–22; 106:5–107:17; Thompson Dep. 140:11–141:16; Roberts Dep. 133:4–135:24.) Roberts also reported that Gutierrez

---

[7] IRIS is the database system ITT used for student information.

and Norris ignored proper recruiting procedures.  (Roberts Dep. 139:2–140:8.)  Mr. Roberts relayed all of this information to Halasa.  (*Id.* at 138:2–141:4.)

### 3.  Career Services Pressured to "Fudge" Numbers

The career services department was also an area of employee concern when Halasa started at Lathrop.  Melanie Papke, a career services coordinator, testified that the career services department was "crazy" because everyone in the department was new.  (Papke Dep. 35:20–36:13; 37:2–14.)  She testified that all of ITT Lathrop was "crazy" when Halasa started.  (*Id.* at 63:4–8.)  This was due, in part, to the fact that Robinson was interested in the college director position before it was given to Halasa and was upset he was not promoted.  (*Id.* at 109:11–19; Robinson Dep. 163:9–21.)

Papke felt extreme pressure in the career services department to "fudge" numbers and complained about this to Halasa.  (Papke Dep. 78:8–16; Halasa Dep. 138:17–139:24.)  For example, Tamara Leonard, the director of career services, urged Papke to prematurely input information into the career services "CS360 system."  (Papke Dep. 39:20–41:15; 41:22–42:4; 74:4–19; 75:14–76:4.)

Papke was trained how to manipulate employment numbers on the Graduate Employment Information ("GEI") forms.  (*Id.* at 59:10–60:14.)  Students and career services employees were pressured to verify that the graduate's job utilized skills taught in their course of study at ITT.  (*Id.* at 66:21–67:6; 80:5–81:5; 83:5–85:24; 89:25–90:19; 103:7–15; 104:6–15; 105:4–23; 125:7–126:10; Halasa Dep.140:18–141:5.)  The graduate's job only counted toward ITT's numerical goals if the graduate spent at least 50% of her time on tasks related to their degree.  (Papke Dep. 66:21–67:6; 80:5–81:5; 83:5–85:24; 89:25–90:19; 103:7–15; 104:6–15; 105:4–23; 125:7–126:10.)  Career services employees were pressured to ensure students checked the corresponding field on the GEI, even if it took some creative manipulation to accomplish this.  (*Id.* at 66:21–67:6; 80:5–81:5; 83:5–85:24; 89:25–90:19; 103:7–15; 104:6–15; 105:4–23; 125:7–126:10; Halasa Dep. 139:25–141:22; 149:19–150:11)

For example, one student graduated with a degree in blueprint reading, was hired to set up displays at a retail store, and was encouraged to mark the 50 to 100 percent field because he was setting something up. (Papke Dep. 58:24–60:14; 83:5–15; 124:22–126:3.) Another student told Papke he was working as a telemarketer and had been pressured to mark the 50 to 100 percent field despite the fact his degree was in construction management. (*Id.* at 66:21–67:6.) Papke submitted an EAL anonymous complaint about Leonard and the way she was running the career services department. (*Id.* at 39:20–41:15.) Papke felt like she was retaliated against for reporting unethical activity and for refusing to fraudulently fill out GEI forms. (*Id.* at 120:3–124:10; 127:3–12.)

The GEI forms were sometimes prefilled, and students and employees were urged just to sign the forms without researching the content of the forms. (Papke Dep. 145:23–147:7.) Angelo Ponce reported similar concerns because his own GEI was already filled out when the career services department presented it to him. (Dep. of Angelo Ponce, Ex. J, 104:3–108:25.) The box for the question "[i]s the graduate utilizing skills and knowledge taught in the core courses of the program?" was already checked—even though Ponce was a construction management and he was working as an ITT representative. (Ponce Dep. 105:24–107:25; Papke Dep. 80:5–81:13; 142:8–143:3; Roberts Dep. 149:17–150:15.)

4.    **Improper Grades and Attendance Changing**

Employees also complained about altered grades and attendance records. Janice Heredia, a representative at the school, took these complaints to Halasa in the summer of 2009. (Heredia Dep. 22:15–19; 25:17–19; 32:10–33:21; 40:8–42:8; 81:3–7; 133:19–135:4.) She reported that there were students who never attended class and yet were not dropped or who never completed any work for the class but passed anyway. (*Id.* at 41:24–42:21; 43:17–44:16.) Papke also was aware there had been inconsistencies at the registrar's office, including document shredding and improperly changed grades. (Papke Dep. 106:12–108:2.) Even Robinson, the dean at Lathrop, was aware of allegations

of grade changing but did not investigate it. (Deposition of Bill Robinson, Ex. I, 29:23–30:1; 152:9–153:5.)

Numerous instructors and other employees reported that ITT pressured them to alter grades and attendance records—John Bell, Bob Roberts, Robert Solari, Jamie Clayton, Cathy Dalsis, Vern Erickson, Angelo Ponce, and John Thompson. (Dep. of John Bell, Ex. K, 26:9–14; 28:3–11; 42:21–43:2; 44:10–13; 44:15–47:17; 59:3–62:6; 67:21–70:12; Ex. L; Roberts Dep. 125:6–126:20; 126:21–127:3.) John Thompson, a representative at the school knew that "fixing grades and attendance" were "big things at the time, too." (Thompson Dep. 125:11–126:1.) He was aware that ITT pressured instructors to mark students as "present" when the student was not in class or to inflate the students' grades. (*Id.* at 127:9–129:3; 129:10–22; 130:21–133:9; 134:14–135:12.) Thompson also overheard students discussing going to the registrar's office to get their grades changed. (*Id.* at 133:10–134:3.) Bell discussed similar experiences with Halasa. (Roberts Dep. 128:15–20; Bell Dep. 72:23–74:11; 75:2–14; 100:10–15; Halasa Dep. 67:17–68:7.)

As dean, Robinson based his review of professors on whether or not they changed grades and attendance. (Halasa Dep. 73:4–74:12.) He instructed professors to alter students' grades and attendance so that ITT could continue to collect financial aid from the government. (Halasa Dep. 79:7–13.) Robinson directed John Bell that Bell needed to change grades and attendance in order to receive bonuses. (Halasa Dep. at 68:8–19; 69:3–12.) Students' grades and attendance are directly linked to the instructors' pay—professors are rated on something called a "success rate," which depends on students' attendance, and which determines the instructor's end of quarter financial award. (Bell Dep. 64:24–66:4.) Roberts was told by an associate dean that Mr. Robinson was pressuring instructors to keep students in class even though the student never attended, and that Robinson pressured instructors to pass undeserving students just because ITT wanted to keep those students enrolled. (Roberts Dep. 125:6–126:20.) Robinson directed professors to change grades

and attendance. (Halasa Dep. 72:7–14; Ex. M.) Halasa reported that nine out of ten professors indicated that Robinson told them that students "must pass." (Halasa Dep. 80:9–24.) Bell and Roberts brought these concerns to Halasa. (Roberts Dep. 125:6–126:20; 127:15–128:13; 128:15–20; 129:3–12; Ex. 61.)

Angelo Ponce, a representative and student at ITT Lathrop, also reported instances of improper grade and attendance changes to Halasa. (Ponce Dep. 84:18–85:3.) Ponce gathered extensive information before coming to Halasa with these issues. (Ponce Dep. 85:20–87:13; 90:14–93:23.) Ponce and Roberts talked to students who passed their classes despite not attending class not turning in class projects. (Ponce Dep. 142:2–146:10; 163:12–166:10; 184:4–185:24; Roberts Dep. 130:10–131:10.) Roberts brought this to Halasa's attention. (Roberts Dep. 131:21–132:16.) Halasa was "appalled" by the prospect of students' grades and attendance being improperly altered. (Ponce Dep. 85:11–86:19.)

Roberts also knew of an ITT student who was dropped from a class for poor attendance but who later wanted to rejoin that class. (Roberts Dep. 123:6–124:6.) The instructor indicated that the student was dropped because he did not attend class and there was nothing the instructor could do for the student. (*Id.*) The following week, that student informed Roberts that Robinson "took care of it." (*Id.*) Roberts brought this incident to Halasa's attention. (*Id.* at 124:21–125:5.)

### d. Dr. Halasa Becomes the "Squeaky Wheel" and is Terminated

Halasa investigated these concerns and complained to his supervisors that ITT was acting illegally and unethically. (Halasa Dep. 49:20–50:8; 50:13–51:13.) ITT's assertion that Halasa "never" investigated these complaints is false (Doc. 60 ¶¶ 50, 57, 65, and 66) and contradicted by testimony from Halasa and other Lathrop employees.

Halasa followed up with representatives regarding the lead issue. (Thompson Dep. 48:13–15.) He investigated the issue of illegal representation compensation, and he later informed Roberts

that the issue was being "looked at." (Roberts Dep. 47:19–49:21; 50:14–52:4; 53:8–54:5.) Halasa discussed inappropriate placement test activities during weekly meetings with Lathrop representatives and instructed staff that this practice had to stop. (Halasa Dep. 52:8–54:12; 92:19–94:9.) Halasa told everyone at the Lathrop Campus, including the Director of Financial Aid, the Director of the Registrar, the Dean of the school, and Norris, that people were illegally changing placement test scores. (Halasa Dep. 108:15–109:2.) Halasa cannot remember if he told Urschel about this illegal activity, but he definitely told his district manager, Ortega, as well as Carpentier, Hemphill, and Menzer. (Halasa Dep. 109:3–113:20; 113:21–114:21; 114:25–115:11; 116:12–117:18; 117:23–118:16.)

Halasa took concerns about improperly altered grades and attendance records very seriously. (Papke Dep. 33:22–34:3; 45:14–25.) Halasa investigated reports of pressure to change grades. (Ex. 61; Bell Dep. 48:2–59:18.) More than once, Halasa counseled Robinson against forcing teachers to illegally change grades or change attendance. (Halasa Dep. 55:5–56:9.)

Halasa also reported these concerns to ITT. Halasa called headquarters to report the issues at Lathrop regarding lead distribution and corresponding employee favoritism. (Thompson Dep. 143:13–147:5.) Halasa complained about the representative compensation scheme to Hemphill and to Ortega. (Halasa Dep. 121:2–24; 131:6–12; Ex. P.) Hemphill passed his complaints up to John Hawthorne and Simich. (Ex. P.) Halasa explained to Hemphill that several employees had brought their concerns to him about illegal representative compensation. (Halasa Dep. 131:15–133:2.)

Halasa complained to ITT management that staff members were changing scores on placement tests so that consumers could attend ITT and obtain federally subsidized student aid. (*Id.* at 92:12–18.) Halasa discussed inappropriate placement test activities during meetings with Lathrop representatives and complained to ITT about it. (*Id.* at 52:8–54:12; 92:19–94:9.) Halasa also

complained to ITT management, including Tamara Leonard, Urschel and Ortega, about inaccurate job placement figures.  (*Id.* at 138:17–159:24.)

During a meeting in mid to late-August of 2009, Halasa met with Jeff Ortega and Robinson to discuss illegally altering students' grades and attendance.  (Halasa Dep. at 74:13–77:23.)  Halasa told Ortega and Robinson that it was improper to change students' grades and attendance.  (*Id.* at 79:14–81:5.)  Halasa also called headquarters and told Urschel that instructors were being pressured to illegally alter students' grades and that in general there was a great deal of unethical behavior at the Lathrop campus.  (*Id.* at 82:18–83:1; 83:15–84:8.)  Bell believed that Halasa reported these concerns regarding grade changing before he was terminated.  (Bell Dep. at 48:1–11; 100:10–15.)

During Hemphill's first visit to Lathrop, several ITT Lathrop employees, including Halasa, attempted to talk to her about issues other than the September start, but, as Hemphill testified, "[a]pparently there were some issues, but I was not there to address those issues."  (Dep. of Valory Hemphill, Ex. N, 114:16–115:4.)  Hemphill stated that her focus was on the September class start only.  (Hemphill Dep. 147:9–148:20.)   She stated that Halasa should have gone to Ortega with his problems and that Ortega would have taken it up the chain of command.  (Hemphill Dep. 115:12–3; 123:19–24.)  Halasa also attempted to question Hemphill about the appropriate relationship between the records coordinator and recruiters, but Hemphill shut Halasa down.  Hemphill would not go back to investigate or address things that had occurred in the past.  (Hemphill Dep. 128:16–22; 129:3–18; 139:12–19.)

Sometime in late August, Simich recommended Halasa's termination to Feichtner. Significantly, Simich was unable to recall any particular event that precipitated his decision to recommend termination.  (Simich Dep. 146:9–24; 147:8–20.)  Simich was the direct supervisor of all district managers and acted as district manager for Lathrop's district after its District Manager, Jeff Ortega, resigned.  (Simich Dep. 29:2–7; 29:12–30:1; 30:24–31:15.) Simich spoke with Halasa only

twice—once on the phone and once in person. (Simich Dep. 153:14–20; 178:18–24.; Dep. of Mark Urschel, vol. I, Ex. MM, 152:17–153:18.) The first time he met Halasa in person was to fire him. (Urschel Dep. 152:17–153:18; Simich Dep. 178:18–24.) When Simich discussed Halasa's termination with Esbin and Feichtner, he reviewed Halasa's EALs, but not his Performance Planning and Evaluation ("PP&E") form, the form ITT uses to evaluate employees. (Simich Dep. 158:2–17; 179:19–23; 189:21–190:3.)

Esbin drafted the memorandum terminating Halasa. (Simich Dep. 162:8–21; Ex. R.) The reason ITT provided for Halasa's termination was nebulous: "loss of confidence in his ability to lead the college." (Simich Dep. 163:4–12.) The termination memo referenced problems in the recruitment area and career services. (*Id.* at 164:11–20.) Simich terminated Halasa on September 9, 2009. (Halasa Dep. 15:1–2; Urschel Dep. 34:24–35:6; 121:21–25.)

Thompson testified that ITT was "getting rid of the squeaky wheel" when it fired Halasa. (Thompson Dep. 147:2–5.) The prevailing view at ITT Lathrop was that before he was terminated, Halasa had been questioning different ITT practices. (Papke Dep. 30:13–31:24.)

### e. ITT's Reasons for Terminating Halasa are Pretext

ITT's proffered reasons for Halasa's termination reveal that he was, in fact, terminated for complaining. Six out of nine "incidents" that ITT claims led Simich to recommend Halasa's termination are the same incidents that Halasa cites as evidence that he complained. ITT attempts to narrowly construe the subject of Halasa's complaints, but Halasa and Lathrop employees tell a different story. As the non-moving party, Halasa's version prevails on summary judgment. As Halasa's complaining became more persistent and his language more colorful (e.g. Halasa's reference to the "Mafia") ITT's patience waned. Halasa wouldn't be silenced and for this ITT deemed him to have "poor leadership" and "judgment." The bottom line: Halasa was fired for complaining, ITT's reasons make this clear.

### i. Dr. Halasa's email regarding Mr. Frisenda

One reason ITT claims it terminated Halasa was because of an email Halasa sent in April alerting Lathrop Campus employees that John Frisenda, the associate dean, had been terminated. (Urschel Dep. 126:21–127:14; Doc. 60 at ¶¶ 9–12.) ITT supposedly disapproved of the subject of the email and did not agree with Halasa's use of a religious phrase in the email. (Urschel Dep. 127:2–14.) Ortega allegedly discussed the email with Halasa and provided guidance on how to handle the situation in the future. (Urschel Dep. 128:9–15.) Simich did not recall "doing a whole lot about it because it appeared to be handled." (Simich Dep. 54:1–6.) The incident was not recorded in any way in Halasa's personnel file. (Urschel Dep. 128:16–23; 128:16–23.) The incident did not lead to any change in pay or demotion for Halasa. (*Id.* at 129:5–8.) ITT can not confirm that Simich ever received the allegedly inappropriate email. (Urschel Dep. 129:9–17; Simich Dep. 51:15–52:4.) There was no discussion of terminating Halasa's employment because of the email. (*Id.* at 130:2–5.) Urschel, speaking for ITT, testified that Halasa listened to Ortega's advice and "was agreeable" to the guidance he received. (*Id.* at 130:6–10.)[8]

### ii. Ethics Alert Line Complaints

Another reason ITT claims it terminated Halasa was because of several Ethics Alert Line ("EAL") complaints. (Doc. 60 at ¶¶ 17–18.) Simich, Ortega, the human resources department, and the compliance department were all aware of the EAL complaints. (Urschel Dep. 133:20–134:13; 134:23–135:5; 135:19–25; Ex. DD, Ex. EE, Ex. FF.) ITT's position is that in investigating the EAL complaints it "identified that there were some concerns regarding perceptions about Dr. Halasa." (Urschel Dep. 130:21–132:3.) ITT was unable, however, to identify any employees who had a

---

[8] In its brief, ITT points out that Dr. Halasa had a different recollection of the incident. (Doc. 60 at 9.) However, Mr. Urschel's testimony as the corporate designee shows how ITT viewed the incident at the time.

negative perception of Halasa. (Urschel Dep. vol. II 35:10–36:15.) Significantly, ITT investigated the EAL complaints, didn't find any violation of policies, and labeled the complaints "unsubstantiated." (Urschel Dep. 134:6–13.)The concern, according to Mark Urschel, the human resources partner assigned to the Lathrop Campus, "was more regarding how some of his actions created negative perceptions with employees." (Urschel Dep. 132:4–133:5.) ITT admits that Halasa was responsive to Ortega's direction. (*Id.* at 133:11–17.) At the time ITT investigated the EALs, it did not discuss terminating Halasa. (Urschel Dep. 134:14–17.)

One EAL complaint alleged that Halasa called himself the king, referred to an employee as "sweetheart" and was having someone else take an "e-course" for him—this complaint also was unsubstantiated. (Urschel Dep. vol. II 30:12–31:2; Ex. FF; Ex. HH.) Jeff Ortega suspected this EAL complaint was filed by Lathrop employee, Joanne Matts. (Urschel Dep. vol. II, 19:25–2-:19; Exs. FF.) Ms. Matts also complained about Halasa's efforts to make sure employees were where they were supposed to be when they were supposed to be there. (Urschel Dep. vol. II 19:25–20; Ex. FF.) Ms. Matts was fired for performance problems soon thereafter. (Urschel Dep. Vol. II 19:25–20.) This complaint was also unsubstantiated. (Urschel Dep. vol. II 27:22–28:25.) ITT did not internally discuss terminating Halasa after this incident, and no counseling form or Corrective Action Form was completed regarding the complaint. (Urschel Dep. vol. II 19:4–24; 43:6–22; Ex. FF; Simich Dep. 95:18–96:25; 101:17–102:6.)

Despite this, ITT touts this EAL complaint as raising "concerns about [Halasa's] judgment and abilities to lead the campus." (Doc. 60 at ¶18.) Simich testified that Halasa was "overly zealous," which could create a negative reaction with his staff—but none of the representatives deposed in this case indicated any problems with Halasa's leadership style. (Simich Dep. 91:6–15; *see* Section II.d, *supra*.) The evidence also shows that Simich disregarded Ortega's view of the incident, who was Halasa's direct supervisor. (Simich Dep. 119:21–120:12.) Ortega determined that Halasa

had a different style and was out in the actual school more often, which was not a bad thing. (Urschel Dep. vol. II 19:4–24; Ex. GG.)

One EAL complained that Halasa was seen smoking a hookah pipe. (Ex. DD.) However, ITT's investigation into the incident revealed that this did not violate any ITT policy, but instead there was a "concern of perception by the students and the employees." (Urschel Dep. vol. II 69:1– 7.) Simich did not believe that Halasa was smoking anything other than tobacco in the hookah pipe. (Simich Dep. 105:23–106:1.) This EAL was investigated and was considered "unsubstantiated." (*Id.* at 118:2–8.) Ortega was aware that Halasa smoked a hookah, but determined it did not violate any policy, as it would fall under ITT's standard smoking policy. (Ex. GG.) Halasa was counseled regarding the hookah pipe, and both James Anders and Ortega pointed out the cultural differences involved in the hookah pipe. (Urschel Dep. Vol. II 69:12–20; 109:6–24; Ex. GG; Ex. CCC ¶ 3.) No counseling form was issued for the EAL complaints filed against Halasa. (Simich Dep. 128:7–129:2.)

### iii. Distribution of Leads

ITT's third reason for terminating Halasa was his handling of lead allocation at the Lathrop Campus. (Doc. 60 at ¶¶ 19–27.) However, ITT testified that the issue of lead allocation was investigated and closed:

> one of the other issues related to some complaints that were made regarding the distribution of leads. And in that situation [Dr. Halasa] was, he and others were involved in looking into the complaints. There were some specific students that were identified, and for each of those, the evidence showed that nothing inappropriate happened. So at that point *the complaint was closed.* And the issue that occurred with Dr. Halasa was that *he continued to want to take some sort of action based on complaints* that had already been investigated, you know, information that was provided and the information that was uncovered during the investigation. There was no wrongdoing found. And again, in these specific examples certain students we actually found that everything happened as it was supposed to. So that investigation was closed, yet *he continued to bring that up with me, with Valerie Hemphill,* [sic] who had visited the campus, and it, that was, I

> think, an issue with his judgment in how to handle a situation like
> that. He had been tasked with putting kind of the complaints behind
> us, moving on and getting people focused on doing their jobs.

(Urschel Dep. 136:6–137:22 (emphasis added).)

ITT presents a narrow view of Halasa's complaints to support its claim that the decision-makers did not have any knowledge of his complaints regarding illegal activity. However, ITT's self-serving position is not supported by the evidence. As indicated above, many representatives believed ITT was illegally compensating representatives based on enrollment numbers and ITT was aware there was an issue. As the non-moving party, Halasa has the benefit of the Court construing all facts in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). ITT's motion should fail because these disputed material facts should go to a jury to ascertain what ITT actually knew and why it actually terminated Halasa.

Gutierrez filed an EAL against Halasa contending that he retaliated against her because she requested a meeting during which she complained about lead distribution. (Urschel Dep. 146:25–149:2; Ex. EE.) However, again, the EAL was not substantiated. Urschel testified that

> We *didn't find that he had retaliated against her as she complained*, but we
> did—again there was an issue *we had a situation, it had been resolved, yet he
> continued to bring it up*[.]

(Urschel Dep. 146:25–149:2 (emphasis added).) Once more, ITT argues that Halasa was only complaining about certain things outside the FCA's protection. However, that is <u>not</u> what Halasa or any of the representatives said. The long list of complaints detailed above demonstrates the numerous topics and instances on which Halasa and the other employees complained. ITT acknowledges the fact that Halasa *continually complained* about representative issues. (Urschel Dep. 146:25–149:2.) The decision-makers were all aware of Halasa's complaints. (*Id.* at 146:25–149:13.)

Urschel testified that even after ITT corporate "closed" an investigation or issue, Halasa would follow up with that issue and would complain that ITT should take action—that Halasa

always "wanted to address something that we had already settled." (*Id.* at 150:19–151:5.) Urschel admitted that Halasa called and asked Urschel what he was going to do about the representatives, when Urschel felt the investigation was closed. (*Id.*) ITT was aware of the same issue—not letting things go—regarding the complaints about Robinson's activities at the Lathrop Campus. (Urschel Dep. 151:6–23; Ex. II)

### iv. Valory Hemphill's Visit

ITT cites Hemphill's visit to the Lathrop Campus as another reason it terminated Halasa. (Doc. 60 at ¶¶ 22, 27; Urschel Dep. 138:10–139:6.) When Hemphill visited the Lathrop Campus, she received a multitude of complaints from the representatives. (Urschel Dep. 138:10–139:6.) ITT headquarters was aware of Hemphill's visit. (*Id.* at 139:17–23.)

Heredia testified that when Hemphill came to the Lathrop campus, Hemphill held herself out as someone who was there to help with all of the recruitment issues that had been going on at the Lathrop campus. (Heredia Dep. 71:11–72:10; 140:11–141:10.) Ms. Heredia complained to Ms. Hemphill about several financial aid issues. (Hemphill Dep. 140:15–18; 155:5–19.) However, Hemphill never addressed any of the representatives' complaints, and instead representatives were retaliated against for bringing complaints to Ms. Hemphill's attention. (Heredia Dep. 71:11–72:10; 140:11–141:10.) Roberts brought his concerns to Hemphill, but she told him she was not there to put out fires, just to make sure Lathrop made its September starts. (Roberts Dep. 79:12–80:7; Hemphill Dep. 111:11–21; 139:20–25.) Thompson informed Hemphill that as a representative, he was not receiving any support from his director of recruitment. (Hemphill Dep. 104:3–4.)

Ms. Hemphill made a second visit out to the Lathrop Campus between August 18 and 22. (Hemphill Dep. 151:2–7.) She met with Dr. Halasa immediately when she arrived. (*Id.* at 153:20–154:3.) Representatives were not meeting their numerical goals, so Dr. Halasa, Mr. Menszer, and Ms. Hemphill held counseling sessions with each representative. (Hemphill Dep. 156:25–158:7.)

The only two issues Ms. Hemphill reported back to headquarters were the issues of lead misallocation and the need to meet September start goals. (Hemphill Dep. 169:6–14.) After Hemphill refused to address Halasa's questions regarding lead allocation, he continued to bring it up and asked why ITT was not taking the problem more seriously. (*Id.* at 130:15–131:4.) Hemphill felt that Halasa kept things "stirred up" at the Lathrop Campus after she thought issues had been put to rest. (Hemphill Dep. 168:13–169:5; Ex. Q.)

Hemphill indicated that Dr. Halasa did not understand why headquarters was not taking the issues with the Lathrop representatives more seriously. (Ex. JJ.) Hemphill managed to quiet the campus down, but Halasa continued to complain about the illegal and unethical activity at the Lathrop Campus. (Urschel Dep. 140:9–141:11.) What stuck out for Simich was the "continual disarray" of the representative group at Lathrop, and he expected Halasa to take a stronger leadership role. (Simich Dep. 209:23–210:15.) Ortega counseled Halasa about this incident via email and commended Halasa on his response to Hemphill's visit. (Urschel Dep. 139:7–16; Ex. O.)

### v. Internal Audit Rating

During ITT's deposition, ITT claimed it terminated Halasa for Lathrop's "marginal rating" on an internal audit. (Urschel Dep. 141:18–142:12.) However, at the time the marginal rating was given, ITT had not yet decided to terminate Halasa. (Simich Dep. 145:12–25.) The audit report was distributed to a group of people including Esbin. (Urschel Dep. 141:18–142:12.) The internal audit covers the preceding one year time period. (Simich Dep. 135:23-136:7.) Despite the fact that Halasa, who had been director for only six months, was not identified as a "cause" of the problems identified in the internal audit, Simich held Halasa responsible. (Simich Dep. 139:13–140:24.) ITT has offered no evidence that other college directors were terminated for a "marginal" rating.

### vi. Career Services Department

Another reason ITT claims it terminated Halasa was the alleged underperformance of the career services department. (Doc. 60 at ¶¶ 30–33; Urschel Dep. 145:19–146:19; Ex. R.) The career services department's success is measured by how many graduates are employed in their field of study. (Simich Dep. 168:5–12.) This is one of the areas about which Halasa complained to ITT headquarters many times, because of the pressure to manipulate GEI forms. *See* Section II.a.3, *supra.* Simich could not recall how the Lathrop school compared to other schools in its district. (*Id.* at 169:11–170:2.) No counseling form was ever issued regarding Halasa's alleged lack of leadership in the career services department. (Urschel Dep. 145:19–146:19.)

### vii. Barry Simich's Telephone Call with Halasa

ITT also cites Simich's telephone call with Halasa as an incident leading to Halasa's termination. Simich claimed that Halasa did not have a good understanding of the career services and recruitment department. (Urschel Dep. 151:24–152:12; Doc. 60 at ¶¶ 37–41.) When Halasa started at ITT Lathrop, the director of recruitment was out on leave. (Urschel Dep. 151:24–152:12.) While Simich was filling in for the district manager position, he conducted a weekly phone status conference with Halasa. (*Id.* at 148:19–150:6.) Simich did not feel the meeting went well and counseled Halasa on how the next status meeting should proceed. (*Id.* at 148:19–150:6.)

Halasa's recollection of the meeting does not match Simich's. Halasa testified that Simich ran the meeting very differently than Ortega had always done. (Halasa Dep. 22:5–23:10.) At the time, there were several functional department manager vacancies, so only two managers took part in the phone call, but Halasa believed his two directors were prepared. (Halasa Dep. 23:6–10.) This seemingly innocuous phone call took place *after* the Valory Hemphill visit (which Simich had knowledge of) and *after* Halasa had been complaining for months. (Urschel Dep. 139:17–23.) In truth, Simich had little personal knowledge of Halasa's skills as a college director. The *first time* Mr. Simich met Halasa was the day he fired Halasa. (Urschel Dep. 152:17–153:18; Simich Dep. 178:18–

24.)  Simich had never actually visited the Lathrop Campus while Halasa was college director.  (*Id.*)

Simich denied even knowing that Halasa has an accent.  (Simich Dep. 155:1–156:2.)  His

determination regarding Halasa was made based on emails and phone calls.  (*Id.*)

### viii.   Operational Review with Gene Feichtner

ITT claims that Halasa was provided with the topics that would be reviewed during an

operational review with Feichtner, and yet Halasa was unprepared.  (Urschel Dep. 154:20–156:5;

Doc. 60 at ¶¶ 13–15.)  Simich did not recall taking any action in response to this alleged incident and

was not aware of any document communicating Feichtner's dissatisfaction with Halasa.  (Simich

Dep. 66:13–19; 70:6–14.)   However, ITT did not issue any counseling form or Corrective Action

Form to Halasa regarding this operational review incident.  (Simich Dep. 76:22–77:16; 77:17–78:6.)

### ix.   "Mafia" comment

Finally, ITT claims that one of the reasons it fired Halasa was that he used the word "Mafia"

in a conversation with the auditors to complain about the situation of illegal activity at the Lathrop

Campus.  (Urschel 156:6–15; Doc. 60 at ¶¶ 28–29.)  This was communicated back to headquarters,

and Ortega, Carpentier, Simich, and Urschel were all aware of the incident.  (Urschel Dep. 154:20–

156:26; Simich Dep. 202:22–203:2.)  Urschel admitted that ITT knew Halasa was using the word

"Mafia" as a metaphor, but that ITT simply thought it was a bad choice of words.  (Urschel Dep.

157:1–22.)  Simich did not know how to take Halasa's use of the word "Mafia."  (Simich Dep.

169:11–170:8.)

### f.   None of these So-Called Incidents Resulted in any (formal or informal) Disciplinary Action

There are *no* counseling forms, written warnings, disciplinary action forms, or Corrective

Action Plans that reflect any performance problems with Halasa at ITT.  (Urschel Dep. 145:2–15;

172:22–173:15; ITT Employee Handbook, Ex. KK, at p. ITT000560.)  ITT has a system in place

where counseling forms are used by an employee's manager to document employment issues, and if

additional issues occur, a corrective action form is used. (Urschel Dep. 209:9–210:8; Ex. CCC ¶ 8.) The only documents that purport to outline ITT's alleged reasons for terminated Dr. Halasa are an email from Ortega regarding the email Halasa sent about Frisenda's termination and an email from Modany expressing disappointment in the internal audit rating. (*Id.* at 143:9–144:21.) Neither of these emails was placed in Halasa's personnel file. (*Id.* at 143:9–144:21.) ITT claims that Ortega told Halasa that his employment was in jeopardy if things did not improve—but ITT has *no* evidence of this. (*Id.* at 158:19–160:16; 177:6–7.) ITT was unaware of any discussion regarding a Corrective Action Form after any of the alleged "incidents" that ITT claims led to Halasa's termination. (*Id.* at 174:5–9; 175:1–3; 175:17–21.)

### g. Dr. Halasa was an Effective College Director

Halasa impressed his staff and colleagues with his effectiveness and competency. (Bell Dep. 16:18–23; 17:2–18:7; 18:19–19:21; 24:10–25:9; Thompson Dep. 17:23–18:17.) Ponce testified that Halasa was a "very student-oriented person with an open ear for suggestions…." (Ponce Dep. 16:23–17:12.) Halasa had a strong educational background and listened to ITT employees and functional directors. (Papke Dep. 17:21–19:15.) Heredia believed that Halasa was very personable and had an open-door policy. (Heredia Dep. 18:9–19.) This was in comparison to other college directors, who did not have an open door policy. (Roberts Dep. 20:25–21:12; 21:24–22:11.) The only potential weakness Roberts could think of—Halasa's accent. (*Id.* 21:13–20.)

Records reflect that ITT also believed Halasa was doing a good job at Lathrop. Halasa's PP&E evaluation was issued sometime in July and indicated that "[a]t midyear the Lathrop college is positioned to have a successful 2009 in the areas of PBT, census, and gross attrition." (Simich Dep. 188:12–20; Ex S.) When pressed to explain the abrupt change between July and September, Simich's answer was underwhelming: "It was just the escalation of the poor judgment that we were

saying." (Simich Dep. 189:6–9.) Recruitment numbers were "at plan," and Simich could not recall whether recruitment numbers went down during that time. (*Id.* at 189:10–20.)

### h. Dr. Halasa was Treated Differently than Robinson

Robinson, the Lathrop registrar and later dean, was treated differently than Halasa. In contrast to Halasa, Lathrop employees believed that Robinson was unethical. (Bell Dep. 84:5–12.) Robinson was known for manipulating numbers and conversations. (*Id.* at 83:15–18; 88:17–89:7.) People did not trust him. (*Id.*) Robinson was a "numbers driven individual." (*Id.* at 79:3–80:6; 83:5–9.)

Many ITT employees expressed disdain upon learning that Robinson was appointed dean. Shelly Hanible requested to be transferred out of the Finance Department because of Robinson. (Urschel Dep. vol. II 142:16–143:13; Exs. T; U.) Hanible felt her job was in jeopardy once Robinson received the promotion. (Exs. T; U.) William Bragg stated that Robinson was a poor choice for dean because he was a poor leader, was adversarial, and operated by "sneak attack." (Ex. V.) Dalsis claimed that working with Robinson actually made her *physically ill.* (Exs. W; X.) Verner Erickson characterized Robinson's appointment as a "good ole boys" decision. (Ex. YY.) Others expressed similar sentiments. (Exs. ZZ; AAA; BBB.)

ITT handled these complaints about Robinson differently than those about Halasa. Urschel talked to Ortega about the emails he was receiving regarding Robinson's promotion to dean, but ITT never conducted an investigation. (Urschel Dep. vol. II. 147:3–7.) ITT did not counsel Robinson regarding the perceptions of Lathrop employees. (Urschel Dep. vol. II 147:8–148:10.) This is inconsistent with ITT's concern for anything Halasa did that might have affected the "perception" around Lathrop.

The results of Lathrop's internal audit illustrate how differently ITT treated Robinson versus Halasa. (Doc. 60 at ¶¶ 34–36.) While Halasa was not a cause of the problems identified in the

report, Simich testified that he still held Halasa responsible for the problems. (Simich Dep. 139:13–140:24.) Robinson, who was the acting dean during the time covered by the internal audit, *was* identified as the "cause" of several problems, yet Simich did not question his effectiveness as a dean. (Simich Dep. 129:3–130:11; 143:12–25; Ex. Z at pp. 6, 8, 9, 12.)

ITT headquarters received an email complaint from Charlotte Rector reporting that Dr. Halasa was concerned about Robinson giving Norris increased access to certain records. (Simich Dep. 198:11–199:13; Exs. VV; AA.) Simich did not recall the complaint and did not know if it had been investigated, but he trusted others to ensure ITT was compliant. (Simich Dep. 199:14–21.)

There were additional EALs about Robinson. Halasa forwarded Urschel evidence that Robinson was attempting to undermine Halasa's authority at Lathrop. (Ex. BB.) Urschel only forwarded this to Ortega. (Urschel Dep. 132:25–134:6.) Robinson was not counseled individually, but Halasa and Robinson were encouraged to work together. (*Id.* at 136:2–137:6.) Halasa completed two counseling forms for Robinson for insubordination and providing Norris increased access to the system. (Exs CC; BB.) After Halasa was terminated, Robinson's counseling forms and corrective action forms were actually *deleted* from his personnel file. (Ex. Y.)

## III.   Argument

Under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, an employer that receives federal funding is prohibiting from terminating an employee "because of lawful acts done by the employee…in furtherance of other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h). A plaintiff may proceed under this subsection without proving an underlying qui tam action. *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 478–79 (7th Cir. 2004).

ITT's motion for summary judgment must fail because (1) Halasa's actions were "taken 'in furtherance of' an FCA enforcement action and were therefore protected by the statute;" (2) ITT was aware that he was investigating and complaining about ITT's potential FCA violations; and (3)

Halasa's termination was motivated, at least in part, by his investigations into ITT's improper actions. *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002); *see also Fanslow*, 384 F.3d at 479.

### a. Halasa Engaged in Protected Conduct

Halasa's complaints are protected conduct because he had a good faith belief, and a reasonable employee in the same circumstances would have believed, that ITT was committing fraud against the government. *Fanslow*, 384 F.3d at 480–81. The concept of "protected activity" is interpreted broadly, in light of the purpose of the FCA. *United States ex rel. Howard v. Urban Invs. Trust, Inc.*, 2010 U.S. Dist. LEXIS 20748 (N.D. Ill. Mar. 8, 2010) (citing *Fanslow*, 384 F.3d at 479).

The recent FCA amendments indicate the whistleblower statute was intended to protect a broad scope of behavior. In the earlier version of the statute, an employee's actions were protected if they were "done in furtherance" of bringing a *qui tam* action. However, the current version of subsection "h" expanded protected activity to include "efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3729(h). Congress amended the FCA in 2009 in order to "remove judicially-created limitations and qualifications which have undermined the effectiveness of the False Claims Act." H. Rep. No. 111-97, at 2. The idea was to protect not only those who actually file *qui tam* actions, but also those who "blow the whistle internally or externally without the filing of a *qui tam* action or who refuse to participate in the wrongdoing." *Fraud and Enforcement Recovery Act of 2009*, 155 Cong. Rec. E. 1295, 1300 (June 3, 2009) (statement of Rep. Berman), Ex. LL.

An employee need not have actual knowledge of the FCA or its requirements for his behavior to be considered "protected." *Fanslow*, 384 F.3d at 479. "If so, only those with sophisticated legal knowledge would be protected by [subsection "h"]". *Id.* The statute expressly covers investigatory activities preceding litigation. *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994) (*overruled on other grounds by Graham County Soil & Water Conservation Dist. v. United States ex rel.*

*Wilson*, 545 U.S. 409, 415 (U.S. 2005)).  Congress intended to protect employees "while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)) (original emphasis) (citing *Neal*, 33 F.3d at 864). Such conduct is protected even when a *qui tam* action is not filed. *Id.* (reversing district court's holding (citing *Neal*, 33 F.3d at 864–65; *Childree v. UAP/GA AG Chem., Inc.*, 92 F.3d 1140, 1144, 1146 (11th Cir. 1996); *Ramseyer*, 90 F.3d at 1522).

Halasa need only show that he was "investigating matters that 'reasonably could lead' to a viable False Claims Act case." *Id.* (citing *Neal*, 33 F.3d at 864 (holding that § 3730(h) covers situation where litigation "could be filed legitimately"); *Hopper*, 91 F.3d at 1269 ("plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action"). "Supplying information that sets off an investigation" qualifies as an action in furtherance of an FCA enforcement action to be filed. *Chomer v. Logansport Mem. Hosp.*, 2003 U.S. Dist. LEXIS 19877, *10–11 (S.D. Ind. Oct. 29, 2003).

In *Yesudian*, the plaintiff knew that at least 80% of the defendant's funds came from the U.S. government. 153 F.3d at 739–40. The court concluded that this afforded a "good faith basis for going forward at the time of the retaliation" because, "[g]iven the information he had about [his employer's] finances, it would have been reasonable to conclude there was a 'distinct possibility' he would find evidence of resubmission of the claims." *Id.* Determining whether those claims were actually resubmitted required "the kind of information a plaintiff normally cannot acquire until he files suit and obtains the benefits of court-sanctioned discovery." *Id.* at 740. Thus, the plaintiff's "personal knowledge provided the requisite 'good faith basis' at the time investigation and retaliation to believe the defendants were defrauding the federal Government." *U.S. v. Am. Nat'l Red Cross (Hoyte ex rel. U.S.)*, 518 F.3d 61, 68 (D.C. Cir. 2008) (*quoting Yesudian*, 153 F.3d at 740).

Halasa's knowledge of the financial workings of ITT and the fact that ITT receives a large majority of its income from federal financial aid indicates that he had a good faith basis going forward with his investigation and complaints, and it was objectively reasonable to conclude that he would find evidence of fraud. Halasa is not required to have *first-hand knowledge* of the fraud, as ITT asserts. Instead, Halasa must show only that he held a good-faith belief that a reasonable person in the same or similar circumstances might have. *See Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002) ("there is sufficient evidence in this case of [the plaintiff's] belief" and the plaintiff "reasonably believed he was acting to prevent, or at least report" the fraud).

Halasa's complaints and investigation were based on complaints from numerous ITT Lathrop employees, including Angelo Ponce, Bob Roberts, Janice Heredia, Melanie Papke, John Thomson, Dean Harris, John Bell, Vern Erickson, and Jamie Clayton, as well as his own observations at Lathrop Campus. Based on all this, it was objectively reasonable for Halasa to complain about the wrongdoing to ITT headquarters.

ITT asserts that employees who are tasked with internally investigating fraud must satisfy a "heightened notice standard" in regards to reporting unlawful acts to their employer. *Brandon*, 277 F.3d at 945. However, "[e]ven though an employee's job duties include investigating or reporting fraud, the employee may still engage in 'protected conduct.'" *Hutchins v. Wilentz*, 253 F.3d 176, 192 (3d Cir. 2001). *Brandon* is the leading case on this narrow exception to § 3730's anti-retaliation provisions. In *Brandon*, the associate anesthesiologist attended shareholder meetings, and was responsible for filling out Medicare billing reports. 722 F.3d at 938. The cases applying the heightened standard consistently involve an employee whose job entailed regular reviews of compliance with various legal and other standards. *See, e.g.*, *Ramseyer*, 90 F.3d at 1517 (employee was specifically charged with monitoring Medicare); *Eberhardt v Integrated Design & Constr., Inc.*, 167 F.3d 861, 865, 868 (4th Cir. 1999) (plaintiff was leading an effort to organize its accounting system and

records).  As such, the employer would expect reports regarding potential fraud from the particular employee. For instance, in *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 949 (5th Cir. 1994), a contract administrator was responsible for ensuring his employer properly charged the federal government.

The fraud-alert employee standard does not apply to Halasa.  Halasa's position as college director was to serve as a liaison between the functional managers and the district managers. District managers reported to headquarters.  Unlike the anesthesiologist in *Brandon* who filled out billing reports and later became concerned his shareholder doctors were altering billing reports, Halasa was not responsible for setting representatives' "lead" or "start" goals or compensation and was not responsible for turning in his instructors' grades and attendance.  Unlike the consultant in *Ramseyer* who was specifically tasked with monitoring Medicaid compliance, ITT headquarters had its own compliance department which monitored compliance with federal and state regulations.  Unlike the accountant in *Eberhardt* whose specific job was to oversee the accounting and billing system, Halasa was merely the top of the reporting pyramid at Lathrop—he received the functional directors' reports and was expected to focus on those issues that made ITT successful—increasing numbers.  ITT expected Halasa to keep the school functioning smoothly, enrolling customers and reporting increased numbers—it did not expect him to file reports detailing potential incidences of fraud.  The fraud alert employee standard does not apply to Halasa.

### b.  Dr. Halasa was Terminated for this Protected Conduct

Defendants are liable under the FCA because there is overwhelming evidence of the causal link between Halasa's protected activity and his termination.  *See Everroad v. Scott Truck Sys.*, 2010 U.S. App. Lexis 9484, *9 (7th Cir. 2010).  This is more than sufficient to survive summary judgment.  *Id.* Halasa only needs to show that his protected activity was <u>one</u> motivating factor in the adverse employment decision.  *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (emphasis added);

*Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002). A "telling temporal sequence" can demonstrate a causal link between protected conduct and adverse action. *Holland*, 883 F.2d at 1315.

ITT claims that Halasa must show that he reported unlawful activity to the people that fired him. Not true. <u>Direct</u> knowledge is not required—merely *knowledge* of Halasa's protected conduct. ITT's motion for summary judgment fails because Halasa has presented sufficient circumstantial evidence to establish that the decision-makers knew of his protected activity. *See, e.g.*, *Mulhall v. Ashcroft*, 287 F.3d 543, 551–52 (6th Cir. 2002) (noting that this element is easy to establish when the adverse action is taken by the same supervisor to whom the plaintiff has made complaints, but that <u>direct knowledge is not required,</u> and temporal proximity, with other facts, may be enough to establish a causal connection); *Proffitt v. Metro Gov't of Nashville & Davidson Cty.*, 2005 U.S. App. LEXIS 21791, *8–9 (6th Cir. 2005); *Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir. 2003) (where circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence of actual knowledge not required); *accord United States v. Ashley*, 606 F.3d 135, 140 (4th Cir. 2010) (holding that when considering witness retaliation, the "government need not adduce direct evidence of [defendant's] knowledge of a witness's informant status in order of the jury to infer his intent to retaliate" because a smoking gun that reveals the contents of defendant's mind is not required).

Halasa followed the prescribed routes up the chain to Ortega, Urschel, and Carpentier. ITT cannot shield itself by insulating its "decision-makers" from an employee's complaints. ITT indicates that the four persons involved in terminating Halasa were Barry Simich, Gene Feichtner, Kevin Modany, and Nina Esbin. (Doc. 60 at 24.) All of these persons were aware of Halasa's complaints regarding illegal representation compensation based on numbers, the pressure to alter grades and attendance records, and the pressure to manipulate GEI forms. Halasa and other Lathrop employees testified that they complained to headquarters. The persons participating in

Halasa's termination decision were copied on emails discussing the Lathrop Campus and Halasa, and received copies of the EAL reports.[9]  The prevailing view at ITT Lathrop was that before he was terminated, Halasa had been questioning different ITT practices.  (Papke Dep. 30:13–31:24.)  As Thompson testified, ITT was "getting rid of the squeaky wheel" when it fired Halasa.  (Thompson Dep. 147:2–5.)

### c. ITT's Proffered reasons for Halasa's termination are pretext

ITT basically concedes pretext.  The proffered reasons for Halasa's termination reveal that he was terminated for complaining.  While ITT attempts to narrowly construe Halasa's complaints, the fact remains: ITT fired Halasa because he investigated and complained about a wide array of illegal and unethical activity at the Lathrop Campus.

ITT claims that it is Halasa's burden to prove pretext, but that issue has not been addressed by the Seventh Circuit.[10]  The burden should not shift back to him.  The recent amendments to the FCA reveal Congressional intent to *expand* the whistleblower protection.  Nonetheless, Halasa can

---

[9] Urschel Dep. 43:6–22; 132:4–133:5; 133:20–134:13; 134:23–135:5; 135:19–25; 134:6–13; 136:6–137:22; 146:25–149:2; 146:25–149:13; 151:6–23; 139:17–23; 141:18–142:12; 154:20–156:26; Urschel Dep. Vol. II 19:4–24; 43:6–22; Simich Dep. 119:21–120:12; 118:2–8; 202:22–203:2; 204:10–205:11; Halasa Dep. 52:8–80:24; 81:21–96:8; 101:23–106:4; 150:21–151:23; 178:12–194:10; 199:17–200:3; 204:4–205:14; 213:16–221:15; 226:3–15; 230:10–231:25; 484:8–493:18; 500:2–15; 502:7–503:24; 523:18–524:6; 528:4–12; 531:7–534:18; 537:1–538:24; 540:11–541:20; 548:14–549:5; 591:16–594:12; 613:17–21; 622:8–623:9; 635:21–636:3, Exs. P, II, OO, QQ, RR, SS, TT, FF.

[10] The Fourth, Fifth, Sixth, and Ninth Circuit do not require pretext—they require plaintiffs to prove the three elements from the statute—(1) protected activity; (2) employer was aware of protected activity; and (3) adverse employment action because of the protected activity.  Halasa has satisfied this burden.  ITT's motion for summary judgment should be denied on that basis alone.  *See United States ex rel. Patton v. Shaw Servs., L.L.C.*, 2011 U.S. App. LEXIS 5415, *13–14 (5th Cir. Mar. 17, 2011); *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. Va. 2010); *Cafasso v. Gen. Dynamics C4 Sys.*, 2011 U.S. App. LEXIS 5979, *28–30 (9th Cir. Mar. 24, 2011); *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 450 (6th Cir. 2008).  The Second Circuit Court of Appeals considers pretext.  *See Liburd v. Bronx Lebanon Hosp. Ctr.*, 2010 U.S. App. LEXIS 7857, *4–5 (2d Cir. 2010).  As explained in footnote eight, the Seventh Circuit Court of Appeals has not clearly adopted a scheme of proof.

easily show that all of ITT's proffered reasons for terminating him are pretext for retaliating against him.

"Pretext" can sometimes be inferred from "an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). Pretext can also be shown through evidence that the proffered reasons "(1) had no basis in fact, (2) did not actually motivate his discharge, or (3) were insufficient to motivate discharge." *Silverman v. Bd. of Educ.*, 2011 U.S. App. LEXIS 5661, *22 (7th Cir. Mar. 21, 2011). Pretext is not faulty judgment—it is phony reason given by the employer for the employee's termination. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839 (7th Cir. 2009). "Late justification…provided at the eleventh hour in conjunction with Defendant's motion for summary judgment, raises a genuine issue of material fact as to whether this justification is a later fabrication on the Defendant's part." *Simpson v. the Office of the Chief Judge of the Circuit Court*, 559 F.3d 706, 717 (7th Cir. 2009) (internal citations omitted).

In its termination memorandum, ITT's reason for Halasa's termination was broad and vague: it "lost confidence" in his ability to lead the college. (Ex. R.) This was not accidental. Later during ITT's corporate deposition and in its brief, with the benefit of hindsight and looming litigation, ITT claims it fired Halasa because he "lacked the necessary judgment and leadership skills." (Urschel Dep. 35:4–36:6; Doc. 60 ¶ 42.) As explained above in section II.d, a cursory review of the substance of the reasons given by ITT reveals that Halasa was terminated because he complained. ITT's after-the-fact attempt to characterize these complaints as incidents leading to his termination is not supported. There is no evidence that ITT believed any of those incidents warranted termination at the time Halasa was counseled. There were no counseling forms or corrective action forms issued at any time during Halasa's six months. ITT admits it did not discuss termination until Simich made the recommendation.

### d. There are Genuine Issues of Material Fact that Preclude Summary Judgment on Dr. Halasa's *Tameny* Claim

ITT claims in passing that Halasa's California *Tameny* claim must fail "for all the same reasons as the FCA claim." (Doc. 60 at 37.) Glossing over Halasa's *Tameny* claim does not make it go away. ITT has not established that it is entitled to judgment as a matter of law and its motion should be denied.

In California, "[w]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167, 170 (Cal. 1980). A tortious wrongful discharge claim exists where an employee "is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn." *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1090 (Cal. 1992); *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 79–80 (Cal. 1998).

To state a claim under *Tameny*, Halasa must first demonstrate ITT violated a fundamental public policy that is grounded in constitutional or statutory provisions. *Green*, 19 Cal. 4th at 71 (citing *Gantt*, 1 Cal. 4th at 1095). Then, in order to establish a prima facie case of retaliatory discharge, Halasa must show that (1) he engaged in a protected activity; (2) that ITT subjected him to adverse employment action, and (3) that there is a causal link between the protected activity and ITT's action. *Frazier v. UPS*, 2005 U.S. Dist. LEXIS 13894, *29 (E.D. Cal. May 3, 2005) (citing *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (Cal. Ct. App. 2d Dist. 1992)). The "causal link" requires a but-for standard of causation. *Arn v. News Media Group*, 175 Fed. Appx. 844, 847 (9th Cir. Cal. 2006).

Based on the recent amendments to the FCA, the public policy underlying the *Tameny* claim is stronger than ever. Congress amended the statute to provide additional, broad protection to whistleblowers. *See* Ex. LL. Today, with federal debt ever increasing and for-profit schools

consuming more and more federal funding, those same for-profit schools are being carefully

analyzed by the federal government and the general public for the potential waste of taxpayers'

dollars.[11]   Under California law, this recent strong push in public policy is sufficient to establish the

importance of whistleblowers preventing fraud against the federal government—especially for-profit

schools like ITT.  ITT's motion for summary judgment on the *Tameny* claim should be denied.

### e.   The "After-Acquired" Doctrine Does Not Apply

ITT claims that Halasa's damages should be cut off after October 14, 2010 because of the

"after-acquired" doctrine.  (Doc. 60 at 39.)  According to ITT, it would have fired Halasa as soon as

it learned that he was "routinely approving GEI forms with a 'rubber stamp' without verifying that

the proper procedures had been followed[.]"  (Doc. 60 at 39.)  "After-acquired evidence" refers to

evidence of an employee's misconduct that would have led to his termination but was not

discovered until after he was fired and litigation ensued.  *McKennon v. Nashville Banner Publ. Co.*, 513

U.S. 352, 362–63 (1995).  Such evidence, if it exists, does not bar a claim, but merely has the

potential to affect a plaintiff's remedy.  *Id.* at 359–60.  If ITT cannot make out by a preponderance

of the evidence that the "after-acquired evidence" would have led to his termination, the defense

fails as a matter of law.  *See McKennon*, 513 U.S. at 362–63; *Sheehan v. Donlen Corp.*, 173 F.3d 1039,

1048 (7th Cir. 1999).  The court must focus on ITT's "actual employment practices, not just the

standards established in its employee manuals," and the inquiry "reflects a recognition that

employers often say they will discharge employees for certain misconduct while in practice they do

not."  *Sheehan*, 173 F.3d at 1048 (internal citations omitted).  An employer may not "prevail based

---

[11] PBS Frontline: *College, Inc.,* http://www.pbs.org/wgbh/pages/frontline/collegeinc/view/ (last visited May 11, 2011); Hibah Yousaf, *Student Loan Default Rate Creeps Higher*, CNN Money, Sept. 13, 2010, http://money.cnn.com/2010/09/13/pf/college/student_loan_default_rate/index.htm (last visited May 11, 2011); Elizabeth Dias, *For-Profit Colleges: Educators or Predators?*, Time Magazine, http://www.time.com/time/business/article/0,8599,2000160,00.html (last visited May 11, 2011).

only on bald assertions that an employee would have been discharged for the later-discovered misconduct." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 762 (9th Cir. 1996).

ITT's purported "after-acquired evidence" does not reflect "wrongdoing of such severity that [Dr. Halasa] would have been terminated on those grounds alone if [ITT] had known of it at the time of the discharge." *McKennon*, 513 U.S. at 359–60. The testimony cited by ITT does not establish that Dr. Halasa committed wrongdoing at all. Halasa testified that he did not specifically recollect one way or the other. (Halasa Dep. 559:22–560:7.) Furthermore, Halasa never knowingly approved a GEI form he believed contained inaccurate information. (Halasa Dep. 153:1–8.) He indicated that he relied on the expertise and information of his director when signing the GEI forms. (Halasa Dep. 559:11–18.)

The evidence, when viewed in a light most favorable to Halasa, fails to establish beyond a preponderance of the evidence that he would have been fired. The cases focus on "actual employment practices," and ITT had a well documented progressive discipline system. *Sheehan*, 173 F.3d at 1048. Pursuant to this system, ITT issued counseling forms and then progressed to corrective action forms if the employee issues continued. (Urschel Dep. 209:9–210:8; Ex. CCC ¶ 8.) Simich's "bald assertion" in his declaration that Halasa would have been immediately terminated for this alleged offense is insufficient and as a matter of law. *See Sheehan*, 173 F.3d at 1048; *O'Day*, 79 F.3d at 762. ITT has not shown by a preponderance of the evidence that it would have terminated Halasa for allegedly "rubber-stamping" GEI forms. Halasa is not aware of any other college directors that were disciplined or terminated because ITT claimed that director signed GEI forms without verifying each and every piece of information on the form. (Ex. CCC ¶¶ 4–5.) Halasa was never instructed, nor did he receive any training that ITT expected him to independently verify the GEI forms. (Ex. CCC ¶¶ 6–7.) Simich's conclusory self-serving affidavit is insufficient because it

does not set forth any specific facts demonstrating that this alleged violation was "so severe" that Halasa would have immediately been fired. *See McKennon*, 513 U.S. 359–60.

## IV. Conclusion

ITT's Motion for Summary Judgment (Doc. 60) should be denied. Halasa was terminated because he investigated potential FCA violations. He need not prove the underlying FCA violation. In the ITT atmosphere, with the multitude of complaints from Lathrop employees and ITT's documented annoyance at Halasa when he continued to investigate even after his superiors told him the issue was "closed," Halasa has shown he conducted protected activities, his superiors were aware of it, and he was fired because of it. ITT's Motion for Summary Judgment must be denied.

Respectfully submitted,

PLEWS SHADLEY RACHER & BRAUN LLP


/s Katherine E. Taylor
Attorneys for Dr. Jason Halasa

John M. Ketcham, Atty. No. 20747-02
Katherine E. Taylor, Atty. No. 23383-49
Brianna J. Schroeder, Atty. No. 28772-64
PLEWS SHADLEY RACHER & BRAUN LLP
1346 North Delaware Street
Indianapolis, IN 46202
Telephone:    (317) 637-0700

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11th day of May, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Timothy J. Matusheski
LAW OFFICE OF TIMOTHY J. MATUSHESKI
P.O. Box 15758
Hattiesburg, MS 39404-5758
Phone: (601) 307-0221
Fax: (601) 653-7580
tim@mississippiwhistleblower.com

John M. Ketcham
Katherine E. Taylor
Brianna J. Schroeder
PLEWS SHADLEY RACHER & BRAUN LLP
1346 North Delaware Street
Indianapolis, IN 46202
(317) 637-0700
(317) 637-0712 (Fax)
jketcham@psrb.com
ktaylor@psrb.com

Elizabeth Watson
Lynn Hang
Diana Friedland
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7000
Fax: (213) 229-7520
ewatson@gibsondunn.com
lhang@gibsondunn.com
dfriedland@gibsondunn.com

Philip A. Whistler
Christina L. Fugate
ICE MILLER
One American Sq # 2900
Indianapolis, IN 46282-0015
(317) 236-2100
philip.whistler@icemiller.com
Christina.fugate@icemiller.com

    s/ Katherine E. Taylor