UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON HALASA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:10-cv-437-WTL-MJD |
| | ) | |
| ITT EDUCATIONAL SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment. The motion is fully briefed and the Court, being duly advised, **GRANTS IN PART** the motion for the reasons set forth below.

I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court

is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  **FACTUAL BACKGROUND**

The relevant facts of record, viewed in the light most favorable to the Plaintiff, who is the non-moving party, are as follow.

Defendant ITT Educational Services, Inc. ("ITT") is a for-profit corporation that operates ITT Technical Institute post-secondary schools at various locations throughout the country. ITT receives federal funds in the form of student aid loans and grants made to eligible ITT students; indeed, in 2010 approximately 75% of its total cash receipts came from federal funding. ITT must be accredited in order to receive these federal funds. In order to maintain its accreditation and its federal funding, ITT must comply with numerous requirements that are set forth in federal regulations and in the program participation agreement that ITT enters into with the United States. For example, ITT must report accurate student grades to the accrediting association; it must provide truthful graduate employment information; and it must utilize a campus security policy. In addition, ITT must comply with regulations regarding the manner in which its employees are compensated; specifically the regulations govern the circumstances under which an employee's compensation may be affected by the employee's success in securing students' enrollment in ITT or obtaining financial aid for students.

Each ITT campus is managed by a College Director, who oversees five managers, each responsible for a different functional area: Director of Career Services, Registrar, Dean, Director of Finance, and Director of Recruiting. Plaintiff Jason Halasa was hired to be the College Director of the ITT campus in Lathrop, California ("ITT Lathrop") in March 2009. As

Halasa describes it, the school was a disorganized mess when he arrived. A massive remodeling project was underway that had displaced the recruiting department. The positions of dean of the school and the director of career services were vacant for a time, and the director of recruitment and the director of finance were each out for several months during Halasa's tenure at the school.

As College Director, Halasa was also the local ethics and compliance officer for ITT Lathrop. As such, it was his duty to ensure that ITT Lathrop's employees were in ethical and legal compliance and to investigate and take appropriate action if he became aware of unlawful or unethical activity at his school. In fact, Halasa received numerous complaints from ITT Lathrop employees regarding unfair or improper practices.

First, employees in the student recruitment department reported to Halasa that they believed that a particular recruiter, Nichole, was getting more leads about potential students than the other recruiters, apparently because she was friends with an ITT employee who was in a position to distribute those leads. Halasa learned that Nichole was making substantially more money than the other recruiters, and concluded that the only difference that he could discern between the various recruiters was that Nichole was bringing in more students than the others. Halasa was concerned about this because he believed that in order to be accredited a school could not "pay a representative as a function of how many students they're getting or they're bringing into the school." Halasa Dep. at 131. Halasa brought the issue to the attention of his immediate supervisor, Jeff Ortega, and to Valory Hemphill, who was a Regional Director of Recruitment for ITT.

Second, in reviewing placement test data Halasa became aware of the fact that there were prospective students who failed the placement test the first time and then took the test again and received a vastly higher score. Halasa, as an experienced educator, did not believe that such score improvements were possible and suspected that the students were receiving improper assistance on the test or that test scores were being altered in the database to allow students to pass the placement test even though they did not score well enough. Halasa was told by other ITT Lathrop employees that they shared in his belief. Halasa believed this practice was illegal because it would enable students to be admitted to ITT and obtain federal financial aid when they would otherwise not have been able to because of their low placement test scores. Halasa discussed the issue with ITT Lathrop staff at weekly meetings and instructed his employees that the practice was wrong and had to stop. Halasa also discussed his concerns about this issue with Ortega and Hemphill, and also raised the issue with Chris Carpentier, ITT"s director of compliance, and perhaps Mark Urschel, an ITT human resources partner.

Third, in August 2009 Halasa was informed by ITT Lathrop's career services specialists that they felt they were being coached to "fudge" the data regarding the employment obtained by the school's graduates, and specifically whether the job a graduate had obtained was related to the degree he or she had obtained. The career services specialists reported that they were told to be creative in determining whether a particular graduate's job qualified as related; for example, if someone were selling computers at a retail store, that job could "creatively" count as being related to a degree in computer science. The career service specialists also complained that they were instructed to fill out the reporting form for the student and present it for the student's signature, rather than allowing the student to fill out the form and determine whether his

4

employment was related to his degree. In fact, two students also reported to him that they had been given pre-filled forms to sign that had inaccurate information and that they had refused to sign the forms. Halasa reported to Ortega that he had received an email from a career services specialist complaining about being asked to fudge numbers and informed Ortega that he had asked Tamara Leonard, who was serving as ITT Lathrop's Interim Director of Career Services, to investigate the matter. Halasa also asked a director of career services from another campus to come to ITT Lathrop "for [a] couple of days to give them [Lathrop's career services specialists] some new direction." Halasa Dep. at 158.

     Finally, Halasa heard from instructors at ITT Lathrop that ITT Lathrop Dean Bill Robinson was changing students' grades and altering students' attendance records in order to make the school's statistics look better. Instructors also reported that Robinson told them that their students "needed to pass" and that they believed he was instructing them to pass students who did not earn a passing grade. The instructors felt pressure to comply because Robinson based professors' performance reviews and compensation, including bonuses, on their "success rate," which was linked to their students' reported attendance. Robinson also had the power to not continue an instructor's employment the following semester. During a conference call with Urschel and Carpentier, Halasa told them that he had heard that Robinson was telling instructors that their students needed to pass. He also reported the complaints about Robinson to Julie Shedd, an auditor from ITT headquarters who was conducting an audit at ITT Lathrop. Halasa counseled Robinson about this and other issues on at least two occasions, one of which was a meeting that included Ortega.

On September 9, 2009, just six months after he began working at ITT Lathrop, Halasa's employment was terminated. The reason given by ITT was a "loss of confidence in his ability to lead the college."

### III.  DISCUSSION

Halasa alleges that his employment was terminated by ITT because "he listened to employees' complaints, investigated those complaints, and put his superiors on notice that he believed there were serious legal and ethical violations at the Lathrop Campus." This, he alleges, both violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and constituted tortious wrongful discharge under California law.

### A.  False Claims Act

The FCA imposes liability upon "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [to the United States] . . . [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). Halasa alleges that his termination violated the provision of the FCA that prohibits an employer that receives federal funding from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]". 31 U.S.C. § 3730(h)(1). In order to succeed on his FCA retaliation claim, Halasa must show that (1) his actions were protected by the FCA; (2) ITT–specifically, those at ITT who made the decision to terminate his employment– knew about his protected conduct; and (3) his termination was motivated, at least in part, by the protected conduct. *See Brandon v. Anesthesia & Pain Management Assocs., Ltd.* 277 F.3d 936, 944 (7th Cir. 2002). ITT argues that Halasa

has failed to present evidence from which a reasonable jury could find that he satisfied each of these elements of his claim.

With regard to the first element, the FCA protects actions that are taken in furtherance of a whistleblower action under the FCA as well as actions taken to stop a violation of the FCA. Halasa argues that his conduct falls under the former category in that he was investigating potential FCA violations. *See* Halasa Brief at 35. Halasa correctly notes that he does not have to prove that the underlying FCA violations actually occurred in order to succeed on his retaliation claim; rather,

> the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.

*Fanslow v. Chicago Mfg. Center, Inc.*, 384 F.3d 469, 480 (7th Cir. 2004).

As noted above, Halasa points to several specific problems at ITT Lathrop that he was made aware of that he asserts were potential FCA violations. First, Halasa received reports that leads about potential students were not being distributed fairly among the various employees in the student recruitment department. Assuming that this practice was occurring, Halasa does not explain, and the Court fails to see, how this practice could have resulted in any false claim for payment being made to the government or how he or anyone else reasonably could have believed it would. While the practice may not have been fair to the other recruiters, and may have violated ITT's policy regarding the distribution of leads, Halasa points to no federal regulation or contractual provision that required ITT to distribute leads fairly or pursuant to any particular policy. Accordingly, any investigation that Halasa may have done with regard to how

leads were distributed among ITT Lathrop recruiters cannot form the basis of his FCA retaliation claim.

Halasa also points to his suspicion that potential students were being improperly assisted so that they could pass ITT's placement exam.  Halasa believed this practice was illegal because it would enable students to be admitted to ITT and obtain federal financial aid when they would otherwise not have been able to because of their low placement test scores.  However, Halasa does not point to any federal requirement–statutory, regulatory, or contractual–that required ITT to utilize a placement exam or certify to the government that it only admitted students who were able to pass a particular exam.  Indeed, ITT has submitted an affidavit in support of its assertion that the placement exam at issue, the Wonderlic exam, is used by ITT for internal admission purposes only and the scores are not reported to the government or anyone else outside of ITT.  Burr Aff. at ¶ 3.  Accordingly, assuming that the placement exam problem alleged by Halasa existed, Halasa has failed to demonstrate how this problem could have resulted in any false claim for payment being made to the government or how he or anyone else reasonably could have believed it would.[1]  Accordingly, any investigation that Halasa may have done with regard to possible impropriety in the administration or scoring of placement exams at ITT Lathrop cannot form the basis of his FCA retaliation claim.

---

[1] There is another problem with Halasa's claim that he engaged in protected activity with regard to the ITT placement test–his suspicion that improprieties were occurring was based only on his belief, and that of ITT Lathrop employees who discussed the issue with him, that it was impossible for a prospective student's test scores to increase so dramatically from one test sitting to another.  Halasa concedes that he did not investigate to determine whether anything improper really was occurring or even to determine whether it was possible for an ITT employee to alter an exam score in the computer system.  Halasa Dep. at 102 ("I didn't, you know, went deep enough to understand how, how she will do it.").

With regard to Halasa's remaining allegations, ITT does not dispute that it was required to report accurate data regarding its students' grades and attendance and its graduates' employment to maintain its accreditation and its ability to benefit from government funds; nor does it dispute that the type of improprieties alleged by Halasa regarding this data could, at least in theory, form the basis of an FCA claim if true, although many more dots would have to be connected in order to prove the requisite fraud. *See generally U.S. ex rel. Main v. Oakland City University*, 426 F.3d 914, 916 (7th Cir. 2005) (setting forth the requirements for an FCA claim based on fraudulent certification). As ITT points out, Halasa concedes that it has no specific information about any inaccurate report that was actually made by ITT regarding grades, attendance, or graduate employment. Halasa also has not demonstrated that ITT had an improper compensation policy for its recruiters; rather, he concedes that he only suspected it to be the case based upon his observations of the recruiters' unequal salaries. However, "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Fanslow*, 384 F.3d at 481. On the other hand, the FCA "does not . . . protect an employee who just imagines fraud without proof," *id.,* and that is precisely what ITT argues Halasa is–someone who drew conclusions based solely upon rumors and speculation and complained of problems when he had no proof that problems actually existed.

The Court need not determine which side of the line Halasa falls on or whether he had gathered enough puzzle pieces to enable him to say that he was investigating an FCA claim, because even assuming that he engaged in protected activity with regard to some or all of these alleged improprieties, his claim fails on the second prong of his FCA retaliation claim. Halasa

simply has not submitted evidence from which a reasonable jury could determine that the ITT employees who decided to terminate him were aware of that activity.

ITT alleges, and Halasa does not dispute, that the recommendation to terminate Halasa's employment was made by Vice President of Operations Barry Simich and was approved by Senior Vice President of Human Resources Nina Esbin, Executive Vice President Gene Feichtner, and CEO Kevin Modany. Halasa also concedes that he did not report any of his concerns directly to any of these individuals and that he does not have any direct evidence that they were aware of his various reports of improprieties. Halasa instead argues that he "has presented sufficient circumstantial evidence to establish that the decision-makers knew of his protected activity." Halasa Brief at 29. The only evidence he cites to, however, consists of various deposition excerpts and exhibits that he cites for the proposition that the decisionmakers (Barry Simich, in particular) were "copied on emails discussing the Lathrop Campus and Halasa" and that they received copies of internal ethics complaints that were lodged against Halasa or otherwise involved ITT Lathrop.[2] Essentially Halasa argues that because the decisionmakers were in the loop regarding some aspects of ITT Lathrop generally and Halasa's employment there specifically, it is reasonable to infer that they were also in the loop regarding Halasa's concerns about improprieties that he expressed to Ortega, Urschel, and Carpentier. However, the evidence cited by Halasa establishes only that–as testified to by Urschel–ITT procedures dictate that internal ethics complaints be forwarded to Simich and others at

---

[2]Halasa also points to the deposition testimony of two ITT Lathrop employees who opined that "before he was terminated, Halasa had been questioning different ITT practices" and that ITT was "getting rid of the squeaky wheel" when it fired Halasa. There is no question that many at ITT Lathrop were aware of at least some of Halasa's concerns; however, that fact does not support the inference that the decisionmakers, all of whom worked at ITT's headquarters, had the requisite knowledge.

headquarters and that they were, in fact, informed of internal ethics complaints and the resulting investigations and conclusions. Halasa's concerns were not expressed by means of formal ethics complaints, but rather through conversations with specific individuals, and there is no evidence that those conversations were relayed to Simich or the other decisionmakers or that there was any procedure that would require that they be brought to the attention of those higher in the chain of command by those to whom Halasa spoke.

Even if the inference urged by Halasa could reasonably be drawn, it would not be enough to save Halasa's claim. ITT argues, and the Court agrees, that as Director of ITT Lathrop Halasa is subject to the "heightened notice requirement for employees who are charged with investigating fraud." *Fanslow*, 384 F.3d at 484. Because Halasa was the local ethics and compliance officer for ITT Lathrop who had a duty to investigate and address any unlawful or unethical activity that took place on his watch, "the fact that [he] was alerting his supervisors to the possibility of [employees'] non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring a qui tam action against them or report their conduct to the government." *Brandon*, 277 F.3d at 945. Halasa does not dispute that his complaints were not sufficient to satisfy this heightened requirement; rather, he disputes that the requirement applies to him because he was "merely the top of the reporting pyramid at Lathrop." Halasa Dep. at 28. However, Halasa does not dispute that he was the compliance officer for ITT Lathrop and that he was required to certify that his campus was in compliance with the very regulations and requirements that he alleges were being violated. There is simply no evidence to support Halasa's claim that he would not be expected to address legal and ethical issues at ITT Lathrop as part of his job responsibilities. Halasa therefore has failed to demonstrate that those who made the decision to terminate his employment were aware

that he had engaged in any activity that is protected by the FCA. ITT therefore is entitled to summary judgment on Halasa's FCA retaliation claim.[3]

### B. Wrongful Discharge Claim

In addition to his claim under the FCA, Halasa asserts a wrongful discharge claim under California law. The Court's jurisdiction over these claims is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based upon state law that are closely related to the federal claim in a case.[4] However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). None of these exceptions applies with regard to Halasa's claim. S*ee id.* ("[T]he district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case."). Accordingly, the Court declines

---

[3]Halasa correctly notes that a 2009 amendment to § 3730(h) expanded the definition of "protected activity" to include "efforts to stop 1 or more violations" of the FCA. However, Halasa's claim, repeated throughout his brief, is that he was fired for *investigating* potential FCA violations, a claim that was clearly viable under the pre-amendment version of § 3730(h). Halasa does not argue, and the Court does not believe, that the application of pre-amendment Seventh Circuit precedent applying to such claims was affected by the amendment.

[4]Halasa does not allege that this Court has independent jurisdiction over this state law claim.

to exercise supplemental jurisdiction over Halasa's state law claim and that claim will be dismissed without prejudice.

## IV.  CONCLUSION

For the reasons set forth above, ITT's motion for summary judgment is **GRANTED** with regard to Halasa's claim for retaliatory discharge in violation of the FCA and Halasa's claim for wrongful discharge under California law is dismissed without prejudice.

SO ORDERED:  09/12/2011

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification